NEW YORK STATE ASSOCIATION OF
REALTORS, INC. and Clifford Hall,
Plaintiffs,

v.

Gail S. SHAFFER, Individually and as
Secretary of State of the State of
New York, Defendant.

No. CV 91–1897 (ADS).

United States District Court,
E.D. New York.

Sept. 30, 1993.

Michael T. Wallender, Albany, NY, Goldson & Radin by Howard W. Goldson, Commack, NY, for plaintiffs.

Robert Abrams, Atty. Gen., State of NY by August L. Fietkau, Asst. Atty. Gen., for defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

The plaintiffs commenced this action to obtain a declaratory judgment to declare that Chapter 696 of the New York State Laws of 1989 (N.Y. Real Prop. Law § 442–h) and the regulations promulgated thereunder to establish or enforce "nonsolicitation zones" are unconstitutional. The plaintiffs move for summary judgment pursuant to Fed.R.Civ.P. 56, invalidating Real Property Law § 442–

h(1) and (2) and 19 N.Y.C.R.R. Part 178 in total, as well as invalidating 19 N.Y.C.R.R. § 175.17(a), as applied by the defendant to truthful and non-misleading communications by real estate licensees which do not make a representation regarding the entry or prospective entry into the neighborhood of persons of a particular race, color, religion, or national origin.

The defendant moves for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing the action on the ground that she is entitled to dismissal of the action as a matter of law.

## BACKGROUND

The plaintiff, New York State Association of Realtors, Inc., represents real estate licensees throughout the State of New York and the plaintiff Clifford Hall is a real estate broker in Queens, New York. The defendant Gail Shaffer is the Secretary of State of the State of New York. This case centers around "nonsolicitation orders" issued by the Secretary of State which prevent licensed real estate brokers from soliciting prospective clients directly. The purported reason for these nonsolicitation orders is to prevent the practice of blockbusting. The term blockbusting is defined as a practice whereby individuals "prey[ ] upon the fears of property owners in racially transitional areas and thereby induce the kind of panic selling which results in community instability" (*Zuch v. Hussey*, 394 F.Supp. 1028, 1049 [E.D.Mich. 1975], *partially affirmed and remanded*, 547 F.2d 1168 [6th Cir.1977] ).

Blockbusting is prohibited by a federal statute which states that:

"it shall be unlawful ... [f]or profit, to induce or attempt to induce any person to sell or rent any dwelling by representation regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin" (42 U.S.C. § 3604[e] ).

This statute was "intended by Congress to reach only real estate brokers and their agents" (*Michigan Protection & Advocacy Service, Inc. v. Babin*, 799 F.Supp. 695, 715 [E.D.Mich.1992] ). The practice of block-busting is also prohibited pursuant to a New York State statute which provides that:

"[i]t shall be an unlawful discriminatory practice for any real estate broker, real estate salesman or employee or agent thereof ... to represent that a change has occurred or will or may occur in the composition with respect to race, creed, color, national origin or marital status of the owners or occupants in the block, neighborhood or area in which the real property is located, and to represent, directly or indirectly, that this change will or may result in undesirable consequences in the block, neighborhood or area in which the property is located, including but not limited to the lowering of property values, an increase in criminal or anti-social behavior, or a decline in the quality of schools or other facilities" (N.Y.Exec.Law § 296[3–b] ).

In addition to the above statutes, the New York Secretary of State promulgated a regulation which stated that:

"No broker or salesperson shall induce or attempt to induce in order to sell or lease any residential property or to list same for sale or lease by making any representation regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion or national origin" (19 N.Y.C.R.R. § 175.-17[a] ).

This regulation was initially enforced by "cease and desist" orders. These orders prohibited brokers from soliciting homeowners who notified the Secretary of State that they did not desire to sell or lease their property and did not want to receive solicitations. In addition to the cease and desist orders, the Secretary of State issued nonsolicitation orders in the early 1970s which prevented licensed real estate brokers from actively soliciting homeowners in designated areas in Kings and Queens County.

The issuance of these nonsolicitation orders was challenged in 1979 by a group of realtors. In finding that the implementation of nonsolicitation orders by the Secretary of State was arbitrary and capricious, the New York Court of Appeals stated that:

"The evidence adduced by respondent falls far short of a showing that prohibited racial blockbusting tactics were prevalent throughout the two-county area encompassed by the order. Indeed, the proof does not even establish that such practices were imminent. Rather, it reveals only that homeowners in certain areas of the two counties were subjected to greater solicitation that they had been in the past. However, even in those two specified areas, there is no indication that the majority of those solicitations were purposely infected with racially based representations which placed undue pressure on those homeowners to list their houses for sale. *Hence, the facts before respondent failed to establish any rational basis for promulgation of an order so broad in geographic scope and, therefore, the order was arbitrary and capricious*" (*Hawley v. Cuomo*, 46 N.Y.2d 990, 992, 389 N.E.2d 827, 828, 416 N.Y.S.2d 232, 233 [1979] [emphasis added]).

Apparently simultaneously with the above nonsolicitation orders, the Secretary of State issued an order for various communities within Bronx County which prevented real estate brokers in that area from soliciting listings from residents in any manner including, letters, postcards, telephone calls, door-to-door canvassing, window signs, billboards, advertisement by handbills or news publications, except those of general circulation. It was claimed that nonsolicitation orders restricted speech in an unconstitutional manner and exceeded the authority granted to the Secretary of State for the enactment of this type of regulation.

In reviewing the Bronx nonsolicitation order, the New York Court of Appeals stated that the order:

"leaps well beyond that legislative articulation and interdicts administratively *all* broker-initiated solicitation, not just the *illegal* solicitation as targeted by the Legislature. Thus, the Secretary has gone beyond administering the written law and has, under color of regulatory authority, actually rewritten and extended the law. The agency cannot make unlawful what the Legislature still has on the books as law-

ful" (*Campagna v. Shaffer,* 73 N.Y.2d 237, 245, 536 N.E.2d 368, 369, 538 N.Y.S.2d 933, 934 [1989]).

Following the *Campagna* decision in 1989, the New York State Legislature enacted N.Y. Real Property Law Section 442–h which states, in relevant part, that

"[i]f, after a public hearing and a reasonable investigation, the secretary of state determines that the owners of residential real property within a defined geographic area are subject to intense and repeated solicitations by real estate brokers and salespersons to place their property for sale with such real estate brokers and salespersons, and that such solicitations have caused owners to reasonably believe that property values may decrease because persons of different race, ethnic, social, or religious backgrounds are moving or are about to move into the neighborhood or geographic area, *the secretary of state may adopt a rule, to be known as a nonsolicitation order, directing all real estate brokers and salespersons to refrain from soliciting residential real estate listings within the subject area*" (N.Y. Real Prop. Law § 442–h[2][a] [emphasis added]).

It is asserted by the plaintiffs that this law "on its face and as applied imposes a content based restriction on permissible communication by real estate licensees" (Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at p. 10).

It is undisputed that pursuant to this statute, on May 18, 1991 the Secretary of State imposed five-year nonsolicitation orders on communities within Queens, Nassau, Kings, and Bronx counties. According to the applicable regulations promulgated by the Secretary of State, which are similar to those regulations promulgated prior to the enacting of Section 442–h,

"[a] nonsolicitation order is a directive to all real estate brokers and real estate salespersons. The nonsolicitation order directs that all brokers and salespersons must refrain from soliciting listings for the sale of residential property within a designated geographic area. A nonsolicitation order prohibits any and all types of solicitation directed at or toward homeowners in

the designated geographic area. The types of solicitation that are prohibited include but are not limited to letters, postcards, telephone calls, door-to-door calls, handbills, and postings in public areas...." (19 N.Y.C.R.R. § 178.1).

In addition, these regulations prevent realtors from establishing or relocating real estate offices within a nonsolicitation area without prior approval from the Secretary of State (*See* 19 N.Y.C.R.R. § 178.2).

Specifically, within Queens County, the Secretary of State imposed restrictions upon the communities of Richmond Hill, Woodhaven, Glen Oaks, Floral Park, Bellerose, Queens Village, Cambria Heights, Laurelton, Springfield Gardens, Brookville, and Rosedale (*See* 19 N.Y.C.R.R. § 178.8). In Nassau County the nonsolicitation order covers the town of Elmont (*See* 19 N.Y.C.R.R. § 178.9). In Kings County the restrictions cover the communities of Mill Basin, Canarsie, Flatlands, Georgetown, Bergen Beach, Marine Park, and Mill Island (*See* 19 N.Y.C.R.R. § 178.7). Finally, in Bronx County the restrictions cover Community District 10 which includes Coop City, Pelham Bay, Spenser Estates, Eastchester Bay, Schuylerville, Edgewater, Locust Point, Throgs Neck, Dover Beach, City Island, and Hart Island (*See* 19 N.Y.C.R.R. § 178.6).

The plaintiffs plead six counts in their complaint to support the assertion that the above statute and supporting regulations are unconstitutional, namely: (1) First Amendment, (2) Privileges and Immunities Clause, (3) Equal Protection, (4) Fair Housing Act, (5) 42 U.S.C. §§ 1981–1982, and (6) 42 U.S.C. § 1983.

Since both the plaintiffs and the defendant move for summary judgment, the Court will address the standards used by the Court in addressing such a motion and then examine the arguments advanced by the parties.

### DISCUSSION

#### Summary Judgment Standard:

A court may grant summary judgment "only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact,"

*Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990), and the movant is entitled to judgment as a matter of law (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986]; *see also* Fed.R.Civ.P. 56[c]; *United National Ins. Co. v. The Tunnel, Inc.,* 988 F.2d 351, 354 [2d Cir.1993] [summary judgment standard] ). The Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 [2d Cir.1990]; *Liscio v. Warren,* 901 F.2d 274, 276 [2d Cir. 1990]; *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 [2d Cir.1986], *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987] ).

■ According to the Second Circuit "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict" (*United National, supra,* 988 F.2d at p. 355). Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 [2d Cir.1990] [quoting Fed.R.Civ.P. 56[e]]; *see National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 203 [2d Cir.1989] ). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party" (*Liberty Lobby, Inc., supra,* 477 U.S. at p. 248, 106 S.Ct. at p. 2510; *see Converse v. General Motors Corp.,* 893 F.2d 513, 514 [2d Cir.1990] ).

■ However, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment (*see Western World, supra,* 922 F.2d at p. 121). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable (*see United National, supra,* 988 F.2d at pp. 354–55; *Rattner v. Netburn,* 930 F.2d 204, 209 [2d Cir.1991] ). Finally, the Court is charged with the function of "issue finding", not "issue resolution" (*Eye Assoc., P.C. v. Incomrx*

*Sys. Ltd. Partnership,* 912 F.2d 23, 27 [2d Cir.1990] ).

It is within this framework that the Court addresses the respective motions for summary judgment.

### First Amendment—Freedom of Speech:

■ The First Amendment, which is applied to the states by the Fourteenth Amendment, protects commercial speech from unwarranted government regulation (*See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761–62, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 [1976]; *see also Basiardanes v. Galveston,* 682 F.2d 1203, 1218–19 [5th Cir. 1982] [addressing commercial speech protection] ). Commercial speech is an expression related to the economic interests of the speaker and is entitled to First Amendment protection because "speech does not lose its First Amendment protection because money is spent to project . . . [or] even though it may involve a solicitation to purchase or otherwise pay or contribute money" (*Virginia Pharmacy, supra,* 425 U.S. at p. 761, 96 S.Ct. at p. 1825 [citations omitted] ).

■ The Supreme Court stated that, when examining a situation involving commercial speech, a court must first determine whether the expression is protected by the First Amendment (*Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 65–66, 103 S.Ct. 2875, 2879–80, 77 L.Ed.2d 469 [1983] ). In accomplishing this task, the Supreme Court established a four-part test, as follows:

> "For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest" (*Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 [1980] ).

The *Central Hudson* constitutionality analysis set forth "the general scheme for assessing government restrictions on commercial speech" (*United States v. Edge Broadcasting Co.,* — U.S. ——, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993) [addressing the advertisement of a lottery] ). The *Central Hudson* commercial speech analysis has been applied to situations involving constitutional challenges to statutes regulating housing solicitations by real estate brokers.

### Housing Solicitations

In determining whether a government may impose regulations on housing solicitations, the Court starts with an examination of *Linmark Assoc., Inc. v. Township of Willingboro,* 431 U.S. 85, 86, 97 S.Ct. 1614, 1615, 52 L.Ed.2d 155 (1977), which addressed a local ordinance prohibiting the posting of "For Sale" and "Sold" signs "on all but model homes" (*Linmark, supra,* 431 U.S. at p. 86, 97 S.Ct. at p. 1615). The local ordinance was enacted in response to a perception that white homeowners were leaving a racially integrated community. Since the ordinance differentiated the "For Sale" and "Sold" signs from other lawn signs based solely upon the content of the signs, the Supreme Court examined whether the township had an interest in regulating the content of the communication (*Linmark, supra,* 431 U.S. at p. 94, 97 S.Ct. at p. 1619).

In determining that the ordinance violated the Constitution in that it improperly regulated speech, the Supreme Court stated that "[i]f dissemination of this information can be restricted, then every locality in the country can suppress any facts that reflect poorly on the locality, so long as a plausible claim can be made that disclosure would cause the recipients of the information to act 'irrationally' " (*Linmark, supra,* 431 U.S. at p. 96, 97 S.Ct. at p. 1620). The ultimate holding in *Linmark* was that "the ordinance under review . . . which impairs 'the flow of truthful and legitimate commercial information' is constitutionally infirm" (*Linmark, supra,* 431 U.S. at p. 98, 97 S.Ct. at p. 1621).

Content based restrictions on speech have, however, been upheld by the Supreme Court when a governmental entity has a valid concern to prevent a secondary effect of the protected speech. An example of such a

situation is where a city treats adult movie theaters differently than other kinds of theaters because of the city's concern about secondary effects (*See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 [1986] ). In that situation, the Supreme Court determined that secondary effects of the adult theaters, including increased crime, lowered property values, and decreased quality of life, permitted the city to enact the adult movie ordinance (*Renton, supra,* 475 U.S. at p. 48, 106 S.Ct. at p. 929).

In examining a content based restriction on housing solicitations, the Seventh Circuit recognized that the "regulation of commercial speech based upon content is less problematic [than the regulation of non-commercial speech]. Because of the greater potential for deception or invasions of privacy in the context of some advertising methods, content-based restrictions on commercial speech are more often upheld" (*Curtis v. Thompson,* 840 F.2d 1291, 1297–98 [7th Cir.1988] [citations omitted] ). The *Curtis* decision specifically stated that:

> "Our holding today is narrow: once a homeowner gives notice to a person that he or she does not desire to have the home listed for sale and that he or she does not desire to be contacted by real estate brokers who have previously been made aware of the decision, *the right of a homeowner to decide what he or she will or will not hear, under the right to privacy, plainly outweighs the right of a real estate broker to continue to contact that person in his or her home.* Once actual notice is received by a real estate agent, that agent is barred from contacting the homeowner for the purpose of persuading him or her to list the residence for sale" (*Curtis, supra,* 840 F.2d at p. 1304 [emphasis added] ).

The Seventh Circuit stressed the importance of protecting the privacy of individuals in their own homes, especially "once they have expressed their desire to be left alone" (*Curtis, supra,* 840 F.2d at p. 1305).

In *South–Suburban Housing Center v. Board of Realtors,* 935 F.2d 868, 874–75 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992), the Seventh Circuit, three years later, again addressed the constitutionality of anti-solicitation ordinances enacted in various southern suburbs of Chicago, Illinois. These ordinances prevented real estate brokers from soliciting residents "after such owner or occupant has notified the . . . Village Clerk that he does not wish to be so solicited" (*Id.*). The purpose of these ordinances was to prevent the practice of blockbusting. In addition to the above restriction, four municipalities in the same suburban area enacted limitations on the display of real estate "for sale" signs. This "for sale" sign restriction, however, was repealed by the municipalities prior to the trial of this action apparently due to the advice of counsel (*See South–Suburban Housing, supra,* 935 F.2d at p. 877).

The Seventh Circuit examined the applicable law governing the government's right to restrict commercial speech and the requirement that there be a reasonable "fit" between the legislature's goal and the means chosen to accomplish the goal. It was the ultimate conclusion of the Seventh Circuit that the statutory restrictions " 'directly advance' the interest in residential privacy and exhibit a reasonable relationship between means and ends that guarantees that the restrictions are not more extensive than necessary to achieve their residential privacy purpose" (*South–Suburban Housing, supra,* 935 F.2d at p. 894).

The Sixth Circuit addressed a situation involving a realtor who "mailed solicitation cards to 40 to 60 residents in a two block area . . . in northeast Cleveland Heights" (*Heights Community Congress v. Hilltop Realty, Inc.,* 774 F.2d 135, 141 [6th Cir.1985], *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 318 [1986] ). The District Court determined that in the context of the integrated neighborhood at issue, the solicitation violated the federal blockbusting statute 42 U.S.C. § 3604(e), discussed above. In examining this situation and the application of Section 3604(e), the Sixth Circuit, stated that:

> "A racially neutral form of solicitation may very well contain an obvious representation respecting race in a highly charged

atmosphere such as that described above. Such an atmosphere was not, however, present in the instant case. Although the solicited neighborhood could fairly be described as transitional, in the sense that residents perceived that blacks were moving into it or adjacent areas, its residents were not in the grip of panic. The neighborhood was not the subject of frenzied real estate activity ... While we do not suggest that real estate agents are 'entitled to one bite' in transitional neighborhoods before panic has set in, the essence of the District Court's reasoning is that any form of solicitation in any area into which blacks have moved or are moving is a *per se* violation of § 3604(e). We have serious doubts that such a sweeping restriction on commercial speech would be constitutional, *see Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85 [97 S.Ct. 1614, 52 L.Ed.2d 155] ... (1977), and do not believe that Congress intended the statute to be so applied ... In the absence of evidence of panic selling or other incidents of a racially charged atmosphere that would impute to any real estate solicitation a racial connotation, or evidence of an actual representation respecting race, whether suggestive or direct, there simply has not been a prohibited representation within the meaning of § 3604(e)" (*Heights Community, supra,* 774 F.2d at pp. 143–44).

It appears that the Sixth Circuit closely examined the circumstances of the communities and the statute at issue in evaluating whether the direct mail solicitations violated section 3604(e) by constituting blockbusting. Likewise, this Court will evaluate the circumstances of the communities and the statute at issue in evaluating whether Section 442–h and the regulations are constitutionally permissible.

*New York Real Property Law Section 442–h*

In examining the background surrounding the enactment of the legislation at issue in this case, the Court notes that the New York State Court of Appeals found the nonsolicitation orders previously enacted by the Secretary of State to be improper because the Secretary of State exceeded the authority delegated by the New York State Legislature. In so finding, the Court of Appeals expressly stated that "[i]f the only way to prevent blockbusting is to ban all broker solicitation in certain areas, *that is a policy choice for the Legislature, not for the agency*" (*Campagna, supra,* 536 N.E.2d at p. 371, 538 N.Y.S.2d at p. 936). It appears to this Court that the Court of Appeals strongly implied that the New York State Legislature could make the policy choice that could enable the Secretary of State to enact nonsolicitation ordinances (*See Campagna, supra,* 536 N.E.2d at p. 371, 538 N.Y.S.2d at p. 936). Since the statute was validly enacted, the Court will determine whether it satisfies the constitutional analysis by the Supreme Court in *Central Hudson.*

In examining the constitutionality of Section 442–h, the Court utilizes the test set forth in *Central Hudson, supra.* The first requirement is that the speech at issue concerns lawful activity and is not misleading. It is undisputed between the parties that the ability of real estate brokers to solicit homeowners constitutes lawful activity and that housing solicitations are not *per se* misleading. Accordingly, the first prong of the *Central Hudson* test is satisfied (*See Greater Baltimore Board of Realtors, Inc. v. Baltimore County,* 752 F.Supp. 193, 197 [D.Md. 1990] ).

In reviewing the second prong of the test, the Court must consider whether the state's interest in enacting Section 442–h of the Real Property Law is substantial. The basis for enacting Section 442–h was to empower the Secretary of State to impose the nonsolicitation orders which were deemed improper by *Campagna* based upon the lack of statutory authority for such actions. In fact, the Department of State issued a Memorandum to the Legislature which stated:

"[t]he bill would add a new section 442–h to the Real Property Law to *authorize the Secretary of State to adopt such rules as are necessary to administer and enforce the provisions of the licensing law,* including rules to ensure that licensed real estate brokers and salespersons do not engage in unlawful blockbusting practices and to,

thereby, help stabilize existing neighborhoods and communities" (Memorandum of Department of State, Summary of Provisions of Bill, McKinney's 1989 N.Y. Session Law, 212th Session, at p. 2251 [emphasis added]).

In addition to this summary of the provisions contained in the bill proposing Section 442–h, the following Statement in Support of the Bill was submitted to the legislature, prior to its passage:

"For the past twenty-eight years nonsolicitation orders have been used to combat the pernicious practice of blockbusting and to prevent the spread of the fear and unrest generated by those practices. Experience has shown that home owners in many urban neighborhoods are subjected to intense and repeated solicitation by real estate brokers to place their homes for sale with such brokers, and that the underlying implication of those solicitations is that property values will be decreasing because persons of different ethnic, social or religious background are moving into the neighborhood. These solicitations plan on the fear and uncertainty attendant with change. Even if the words are not spoken the message is delivered. The result is an artificial churning of the market, panic selling, and flight from established neighborhoods. In such a charged atmosphere, the mention of ethnic, social or religious prejudices is unnecessary. Although real estate brokers may argue that the solicitations are intended only to generate business within the neighborhood, the consequence is that individual homeowners, who have been made insecure by the circulation and recirculation of rumors and speculation, are induced to make precipitous decision concerning the sale of their homes. Often those decisions are ill-considered and result in a loss to the community, as well as to the homeowner. The collective impact of these frenzied activity [sic] is to weaken the economic stability [a]nd [sic] the social tranquility of the affected neighborhood" (Memorandum of Department of State, Statement in Support of Bill, McKinney's 1989 N.Y. Session Law, 212th Session, at p. 2251).

The Governor approved this bill and in a letter to the legislature stated:

"As you know from my own experience as Secretary of State, for the past 28 years nonsolicitation orders have proven to be effective tools in combating blockbusting practices and in preventing the spread of fear and unrest generated by such tactics. This past February, the Court of Appeals ruled in *Campagna v. Shaffer,* 73 N.Y.2d 237 [536 N.E.2d 368, 538 N.Y.S.2d 933] (1989), that the rules and regulations of the Secretary of State to restrict blockbusting were not within the scope of the Secretary's authority as delegated under the law. This bill specifically authorizes the Secretary to regulate real estate brokers and salespersons in the prevention of blockbusting activities. It is in the interest of the People of the State of New York that the Secretary of State be granted this authority in order to continue preventing such abusive practices" (Letter from Governor Mario M. Cuomo, dated July 22, 1989, McKinney's 1989 N.Y. Session Law, 212th Session, at pp. 2424–25).

As discussed earlier, the governmental interest in eliminating the practice of blockbusting is a vital goal (*see Linmark, supra,* 431 U.S. at pp. 94–97, 97 S.Ct. at pp. 1619–20). The plaintiffs failed to submit any evidence that the motivation of the New York State Legislature in enacting Section 442–h was anything other than to combat blockbusting by enabling the Secretary of State to issue nonsolicitation orders (*See Greater Baltimore, supra,* 752 F.Supp. at p. 198). Accordingly, the statute meets the second prong of the *Central Hudson* analysis, namely New York State had a substantial interest in enacting Section 442–h.

■ The third part of the Court's analysis centers around whether Section 442–h directly advances the asserted governmental interest. It is asserted by the plaintiffs in their motion for summary judgment that the statute does not further the governmental interest because there have been no incidents of blockbusting in New York State, especially the areas at issue, and therefore no need for the statute.

The plaintiff Clifford Hall submitted an affidavit in which he states:

"During my years as a real estate licensee, I have never observed and have never heard any real estate licensee committing illegal blockbusting activity. Indeed, although I have heard that the Department of State claims that such activity has once occurred in the Metropolitan New York area, I have never witnessed such activity and have never heard of any blockbusting conduct which was attributed to the real estate licensee during the past 30 years. I believe that to the extent that there is racial difficulty or harmony in an area, it is a function of the homeowner, rather than real estate licensee conduct" (Affidavit of Clifford Hall, dated January 20, 1993, at ¶ 5).

In addition, the plaintiffs submitted the affidavit of Charles M. Staro who has been the Executive Vice President of the New York State Association of Realtors since 1970 and stated:

"I am not aware of any case of a real estate licensee committing the pernicious practice of blockbusting during that time. In my years in the New York State Association of REALTORS, I have likewise never seen an adjudication by the Department of State finding a real estate licensee guilty of the pernicious practice of blockbusting, which is prohibited under both federal and state law" (Affidavit of Charles M. Staro, dated February 22, 1993, at ¶ 3).

In addition to the affidavits, the Court reviewed transcripts of proceedings before the Hon. Gail S. Shaffer, the Secretary of State. These proceedings include the statements of Huxley Mitchell, a resident of Queens who lives within one of the nonsolicitation areas, who is also a real estate broker. He stated at a hearing on January 11, 1989 that:

"During the time I have been licensed to sell real estate in New York, I have never witnessed or ever heard of an incident which a real estate broker committed the offense of block busting. I have checked with both local Board of Realtors, the Long Island Board of Realtors, and the New York State Association of Realtors, and have been advised that the records do not contain any complaints that block busting activity has been committed by a real estate licensee in recent years.

Moreover, it was advised by the New York State Association of Realtors and its director of governmental affairs, Donald Savage, inspected the records of the Department of State on December 14, 1989, and did not find a single case of block busting activity.

Furthermore, Mr. Savage was advised by an official of the Department of State that to the best of his knowledge, there weren't any block busting cases in the Department of State files covering 1986 to date.

In addition ... in Mr. Savage's presence, the official placed a call to the Department of State in Mineola, Long Island, to double check and was informed that the office, likewise could not identify or recall any block busting offenses" (Transcript of January 11, 1989 Hearing, at pp. 34–35).

At another hearing, held on February 15, 1993 at Herbert H. Lehman High School in the Bronx, Steven Braunstein, a broker in the Bronx stated:

"The main purpose of this non-solicitation order as it has been presented to us at the Bronx Board [of Realtors] is really on where it is going to stop blockbusting. Well, I believe if it isn't broken don't fix it. In the last six years in the State of New York, there have been no complaints on blockbusting as we know it today. In the twenty years that I have been in the real estate industry, all in Bronx County, I have never once come across blockbusting as we know it today, which is simply the practice of a broker contacting a seller or would-be seller or a potential seller or a homeowner and saying, 'Hey, you better sell your house because there are bad people moving into this area and the value is going to go down.' I have never in twenty years come across this.

Now, to implement a non-solicitation order and say you are doing it because of blockbusting when blockbusting doesn't exist, is just nonsensical. If you want to put a non-solicitation order for other reasons, then state those reasons, but it certainly

isn't because of blockbusting when in six years there is not one case in the State of New York of a complaint being made on blockbusting" (Transcript of February 15, 1990 Hearing, at p. 47).

At the deposition of Gail A. Bates, the Director of Licensing Services for the Department of State, conducted on October 30, 1992, the following transpired:

Q. Is it fair to say that since at least the mid-eighties' period of time, the Department has had no adjudicated case finding of a real estate licensee guilty of the practice of blockbusting?

A. I believe that's true (Deposition of Gail Bates, dated October 30, 1992, at p. 20).

\* \* \* \* \* \*

Q. And did you make any investigation of whether or not there had been falling property values in the County of Bronx?

A. No, I did not.

Q. And would it likewise be true for the County of Kings, Queens and Nassau, that no investigation was made with regard to whether there was actually any decline in property values?

A. Yes.

\* \* \* \* \* \*

Q. I'm not sure if I asked you this. Forgive me if I did. As a result of the hearings on possible non-solicitation orders in the County of Bronx, Kings, Queens and Nassau, did the Department initiate any charges against any real estate licensee for alleged blockbusting?

A. Not to my knowledge.

Q. Are you able to identify any allegation attributed to a specific licensee for blockbusting at this time contained in any of the testimony adduced at any of the hearings for non-solicitation orders?

A. You asked as to a specific licensee?

Q. Right.

A. No.

\* \* \* \* \* \*

Q. Are you able to identify any real estate licensee who has profited from a blockbusting solicitation?

A. In what time frame?

Q. Since 1979.

A. Ruth Cohen.

Q. Other than Ruth Cohen, are you able to identify any real estate licensee?

A. Not specific (Deposition of Gail Bates, dated October 30, 1992, at pp. 89–91).

It appears to the Court that the plaintiff produced evidence that there are no incidents of blockbusting in recent years. As a result, the plaintiff asserts, in this motion for summary judgment, that there is no need for Section 442–h to empower the Secretary of State to act to combat blockbusting because there has been no documented incidents of blockbusting. As stated above, once a party moves for summary judgment, the non-movant must come forward with specific facts showing that a genuine issue for trial exists (*See Western World Ins. Co., supra,* 922 F.2d at p. 121; *National Union Fire Ins. Co. v. Turtur, supra,* 892 F.2d at p. 203).

In opposition to the motion for summary judgment, the defendant submitted numerous transcripts from hearings before the Secretary of State, letters from residents, and sample solicitations in support of the assertion that brokers practice blockbusting. The following constitutes some of the evidence presented by the defendant in support of the assertion that blockbusting still exists and there is a need for legislation and/or regulations to combat the practice.

At a public hearing on January 25, 1990, Cathy Ferrigno, a resident of Elmont, New York stated that "[t]he pattern of racial steering by real estate brokers and their salespeople continues in our community … A little note on the door or stuff in a mailbox saying, we just sold a house down your block, may seen [sic] innocuous but, in fact, starts people, who may have intention of moving, to start thinking about it. It places an idea and it is calculated to do just that" (Transcript of January 25, 1990 Hearing, at pp. 14–16).

Dorothy Storm, the Mayor of the Village of Freeport spoke at a hearing on February 22, 1990 and stated that one tactic used by these alleged blockbusters is to place flyers indicating that houses nearby were recently placed up for sale. One such flyer stated that "Your neighbors at 696, 698 and 700 Miller Avenue have selected us to help them sell their home. I am also available to answer any questions you may have about recent property sales in your neighborhood, or give you a current market evaluation of your home" (Transcript of February 22, 1990 Hearing, at pp. 8–9). Another speaker at this meeting was Assemblywoman Arlene Hill who stated that she received flyers indicating that houses in her neighborhood were being placed for sale (Transcript of February 22, 1990 Hearing, at pp. 10–12).

At a hearing on February 8, 1990, William Guzman, a resident of Richmond Hill, Queens stated that:

"Most of the people who buy houses, buy it for a good cause because they're trying to better themselves. My problem is when I'm outside raking my lawn and someone stops by in a multicolored jacket who seems to perceive that perhaps I speak a foreign language, and I do, I speak Spanish ...

The gentleman will approach me and say in English, hi, how are you doing, nice neighborhood. And I say yes, it's very nice, thank you. And he says, do you speak Spanish, and I say yes. He says, ... Translation, do you know your neighborhood is changing, the Indians are moving in ..." (Transcript of February 8, 1990 Hearing, at p. 52).

On March 8, 1990 a hearing was held at Newtown High School in Elmhurst, Queens at which time Assemblyman Frederick Schmidt stated:

"I've gotten other calls from people who are being told that don't go past such and such a street, because that neighborhood is going down, and then those people who live in a particular area are told to sell their homes now, because the neighborhood is changing. Sell your home while you can get your money for it. And then other people who come into a neighborhood are being pointed at and say, 'Look what's coming into the neighborhood,' and real estate brokers are going through an area telling people, 'You ought to see what's moved in on such and such a block. Now is the time to sell'" (Transcript of March 8, 1990 Hearing, at p. 13).

Assemblywoman Helene Weinstein from Brooklyn spoke at a public hearing on February 1, 1990 at which time she stated:

"There have been many homeowners who have received phone calls that say, 'Well, you know, you don't want to be the last one on your block. You've noticed the neighborhood is changing.' There have been homeowners who have gotten calls saying, 'The house down the block is for sale. You know your real estate prices are going to go down if you don't sell soon.' These are activities that have just happened in the last few months in this area. For a while, when the order was rescinded, it was quite [sic], but now there have been mass solicitations that have occurred, again, both people who have signed cease and desist orders and those who have not" (Transcript of February 1, 1990 Hearing, at p. 13).

At this same hearing, Flo Hirsch, the President of the Bergen Beach Civic Association stated to the Secretary of State that:

"While there are several brokers that are artificially stimulating the sale of homes which could only lead to scaring our residents, they have started. The postal cards have come to may of the residents in our area. We are getting continuous phone calls. If any of our neighbors on the block have sold, we are getting phone calls that the value of our property is going down, our schools are going down" (Transcript of February 1, 1990 Hearing, at p. 66).

Gene Gursky, a Brooklyn resident also spoke at this February 1, 1990 public hearing and stated that:

"On December 27th, I received a phone call from Mr. Garfman of ERA Estee Realty asking me, telling me rather, that he would like to sell my house. He then proceeded to call ten of my neighbors

down the block. You have a letter in your office submitted through City Councilman Berman, through Assemblyman Genovesi to your office stating that Mr. Garfman called her home, also soliciting for her home and stating for her that he had a very nice couple from Jamaica for her home. Now, if that is not a tactic of blockbusting, I don't know what is" (Transcript of February 1, 1990 Hearing, at p. 90).

In addition to the above affidavits and transcripts, the defendant submitted numerous examples of realtor solicitations in the neighborhoods covered by the nonsolicitation orders. The Court examined all of the solicitations and, in the Court's opinion, the following excerpted portions implicitly show blockbusting:

1– *"Communities are always changing in Brooklyn.* Mill Basin homeowners like yourself are aware that these changes may directly affect property values. Many homeowners have unfortunately waited too long before they answered the crucial question: Should I sell now? Many homeowners in communities near you waited until too late to get a fair price for their homes. They had to settle for less than they originally paid"

2– "Dear Mr. ...

We have recently learned that you own property located on ... We'd like to kindly acknowledge you of our interest in purchasing it. In case you are willing to sell it, please contact us at your earliest convenience ...."

3– "... To date, nothing has been so grossly over-emphasized as how weak our local real estate market is!!! It is time to stop and ask, is it as terrible as everyone says it is!?! Yes, we have seen a stabilization in appreciation! Yes, there may be too many homes available than are needed! But, when the conditions are right—houses will sell!!! .... If you're thinking of selling, call ... That is my message for the new year, I hope its clear...."

4– "Your neighbors are now among the millions of families who have picked the [company name] team to help them buy or sell their properties. If you would like to know the market value of your property, give me a call. Put a member of a winning team to work for you"

5– "I am currently working with several buyers who are interested in buying property in this neighborhood. If [you] or anyone you know is interested in selling, please be kind enough to contact me or feel free to pass this information on to anyone who maybe [sic] interested" (emphasis added).

Although the Secretary of State, in opposition to the plaintiffs' motion for summary judgment, failed to submit the names of realtors who have either been investigated or prosecuted for blockbusting, this does not conclusively establish that the practice no longer exists. In fact, the New York Court of Appeals in the *Campagna* decision, which prompted the legislature to enact Section 442–h (*see* Memorandum of Department of State, Existing Law, McKinney's 1989 N.Y. Session Law, 212th Session, at p. 2251), expressly stated that "the record establishes that the subject community was besieged by unlawful blockbusting activity ..." (*Campagna, supra,* 536 N.E.2d at p. 371, 538 N.Y.S.2d at p. 936).

In examining whether there is sufficient evidence to infer that blockbusting exists, the Court looks to a recent Supreme Court decision which addressed a Florida rule prohibiting Certified Public Accountants from engaging in direct, personal solicitation, unless the person being solicited is already a client of the CPA, or invited such a communication (*See Edenfield v. Fane,* —— U.S. ——, ——, 113 S.Ct. 1792, 1796, 123 L.Ed.2d 543 [1993] ). The Supreme Court stated that in the situation involving "a blanket ban ... [where] truthful and nonmisleading expression will be snared along with fraudulent or deceptive commercial speech, the State must satisfy the remainder of the *Central Hudson* test by demonstrating that its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end" (*Edenfield, supra,* —— U.S. at p. ——, 113 S.Ct. at p. 1799).

After examining the Florida solicitation rule under the *Central Hudson* analysis, the Supreme Court stated that the burden of justifying the rule is placed upon the party seeking to uphold the rule and further stated:

> "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must *demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree*" (*Edenfield, supra,* —— U.S. at p. ——, 113 S.Ct. at p. 1800 [emphasis added]).

The Supreme Court was looking for: (1) studies that suggest that personal solicitations by CPAs are harmful, (2) anecdotal evidence to validate the position taken by Florida, or (3) the conduct of the plaintiff to determine whether this conduct suggests that the concerns about accountant advertisements are justified (*See Edenfield, supra,* —— U.S. at p. ——, 113 S.Ct. at p. 1800).

In the present case there were no extensive studies produced by the defendant in opposition to the motion for summary judgment. However, there was presented generalized anecdotal evidence of blockbusting activity. In reviewing the totality of the evidence presented in this case, the Court finds that there is sufficient evidence of blockbusting. Accordingly, the Court finds that Section 442–h furthers the governmental interest of combatting the invidious practice of blockbusting.

Having found that there is evidence that the practice of blockbusting exists, the Court must examine the final part of the *Central Hudson* analysis, namely, whether the statute is narrowly tailored to serve only the asserted governmental interest. When examining the fourth part of the test as to constitutionality, the Supreme Court stated:

> "What our decisions require is a ' "fit" between the legislature's ends and the means chosen to accomplish those ends,' ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' ... that employs not necessarily

the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds, we leave it to government decision makers to judge what manner of regulation may best be employed" (*Board of Trustees of the State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 [1989] [citations omitted]; *see also Edge Broadcasting, supra,* —— U.S. at pp. —— – ——, 113 S.Ct. at pp. 2705–06 [discussing reasonable fit analysis of *Fox* ] ).

Recently, the Supreme Court addressed a situation involving a challenge to a local municipal code provision which prevented the plaintiffs from distributing free magazines in newsracks placed on public streets (*See City of Cincinatti v. Discovery Network, Inc.,* —— U.S. ——, —— – ——, 113 S.Ct. 1505, 1508–09, 123 L.Ed.2d 99 [1993] ). The municipal code provision stated that the free magazines were "commercial handbills" and therefore the plaintiffs were prohibited from distributing them on "any sidewalk, street or other public place within the city" (*Discovery Network, supra,* —— U.S. at p. —— & n. 3, 113 S.Ct. at p. 1508 & n. 3). It was asserted by the plaintiffs that differentiating between newspapers, which were permitted to be distributed in newsracks, and commercial handbills, which were not permitted to be distributed in the same manner, was an impermissible content-based restriction.

In *Discovery Network* there was no claim that the commercial handbills contained unlawful or misleading information, but rather the issue was whether the city adequately established a " 'reasonable fit' between the city's legitimate interest in safety and aesthetics and its choice of a limited and selective prohibition of newsracks as the means chosen to serve those interests" (*Discovery Network, supra,* —— U.S. at p. ——, 113 S.Ct. at p. 1510). The plaintiffs asserted that there was not a "reasonable fit" between the ban on newsracks distributing commercial handbills and the city's interest in safety and aesthetics, as a matter of law, because the city permitted distribution of newspapers in similar newsracks.

The city of Cincinatti asserted that the differentiation between newspapers and commercial handbills was based upon the city's belief that the commercial handbills had a "low value" of commercial speech. However, the Supreme Court recognized that "[b]ecause the distinction Cincinatti has drawn has absolutely no bearing on the interests it has asserted, we have no difficulty concluding, as did the two courts below, that the city has not established the 'fit' between its goals and its chosen means that is required by our opinion in *Fox*" (*Discovery Network, supra,* — U.S. at p. ——, 113 S.Ct. at p. 1516). The Supreme Court concluded that "[t]here is ample support in the record for the conclusion that the city did not 'establish the reasonable fit we require'" (*Discovery Network, supra,* — U.S. at p. ——, 113 S.Ct. at p. 1510 [*quoting Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035]).

In the present case, unlike *Discovery Network,* the goal sought to be corrected is to eliminate or restrict blockbusting, an undesirable practice that both state and federal laws already prohibit (*See* 42 U.S.C. § 3604[e]; N.Y.Exec.Law § 296[3–b]). In enacting Section 442–h, the New York State Legislature provided an additional weapon for the Secretary of State to use in the long standing battle against blockbusting. This statute does not create nonsolicitation areas, but rather permits the Secretary of State to establish these areas if "after a public hearing and a reasonable investigation", the Secretary of State makes an express determination that:

"the owners of residential real property within a defined geographic area are subject to intense and repeated solicitations by real estate brokers and salespersons to place their property for sale with such real estate brokers and salespersons, and that such solicitations have caused owners to reasonably believe that property values may decrease because persons of different race, ethnic, social, or religious backgrounds are moving or are about to move into the neighborhood or geographic area" (N.Y.Real Prop.Law § 442–h[2][a]).

Although the blanket restriction on realtor solicitations in a designated geographic area,

as established by New York State, is more restrictive than the "cease and desist" statutes discussed earlier, the Court recognizes that the legislature need not enact a statute containing the least restrictive means to combat blockbusting, so long as the means are "*narrowly tailored* to achieve the desired objective" (*Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035 [emphasis added]). In addressing the constitutionality of nonsolicitation orders, the New York State Appellate Division stated:

"The governmental interest in preventing blockbusting is substantial and is directly advanced by the nonsolicitation order, the goal of which could not have been as well served by an order less restrictive of commercial speech (*see, Central Hudson ...*).

"Since there is 'a·sufficient "fit" between the legislature's means and ends to satisfy the concerns of the First Amendment, the same "fit" is surely adequate under the applicable "rational basis" equal protection analysis' ... Moreover, the order satisfies due process requirements since it is a legitimate response to blockbusting practices and the accompanying atmosphere of fear and panic achieved through solicitations by real estate salesmen" (*Russo v. Shaffer,* 131 A.D.2d 853, 517 N.Y.S.2d 212, 213 [2d Dep't 1987]).

The statute involved in *Discovery Network,* which prevented all "commercial handbills" from being distributed in newsracks, was enacted without a prior determination by the City of Cincinnati that there was a need to correct a safety or aesthetic problem created by the presence of "commercial handbill" newsracks on the public streets (*See Discovery Network, supra,* — U.S. at pp. ——–——, 113 S.Ct. at pp. 1508–09). On the contrary, Section 442–h specifically requires the New York Secretary of State to make a finding that "owners of residential real property within a defined geographic area are subject to intense and repeated [blockbusting tactics]" (*See* N.Y.Real Prop. Law § 442–h[2][a]). Accordingly, the Court finds that Section 442–h is more "narrowly tailored" than the statute involved in *Discovery Network.*

Section 442–h is also unlike the statute in *Fane* which provided that a CPA "shall not by any direct, in-person, uninvited solicitation solicit an engagement to perform public accounting services ... where the engagement would be for a person or entity not already a client of [the CPA]" (*Fane, supra,* —— U.S. at p. ——, 113 S.Ct. at p. 1796 [*quoting* Fla.Admin.Code § 21A–24.-002(2)(c) ] ). For example, in *Fane* there was no requirement that the Board of Accountancy make an express finding that there were "intense and repeated" solicitations by CPAs prior to the implementation of the solicitation restrictions. Accordingly, the Court finds that Section 442–h is more "narrowly tailored" than the statute involved in *Fane.*

Based upon the Court's determination that Section 442–h of the New York Real Property Law is "narrowly tailored" to achieve the desired objective of combatting blockbusting (*see Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035), Section 442–h satisfies the *Central Hudson* analysis and is a constitutionally permissible restriction on commercial speech. Having found the underlying statute to be constitutional, the Court now must examine whether the regulations promulgated pursuant to the statute's authority are also constitutional restrictions on commercial speech.

*New York Secretary of State Regulations*

Since the Court already determined that Section 442–h of the New York Real Property Law is constitutional, the Court must now examine whether the regulations promulgated by the Secretary of State under the authority of this statute, which are at issue in this case, also pass constitutional muster. As discussed above, the plaintiffs seek to invalidate 19 N.Y.C.R.R. §§ 178.1–178.9 entirely and 19 N.Y.C.R.R. § 175.17(a), only as applied by the defendant to truthful, non-misleading solicitations by real estate licensees which do not make representations regarding the entry or prospective entry into the neighborhood of persons of a particular race, color, religion, or national origin.

The regulations promulgated by the Secretary of State establish nonsolicitation areas within the counties of Bronx, Kings, Queens, and Nassau, and govern the conduct of real estate brokers and salespersons within those established nonsolicitation areas. In defining what constitutes a nonsolicitation order, section 178.1 of the regulations states that it is "a directive to all real estate brokers and real estate salespersons ... [to] refrain from soliciting listings for the sale of residential property within a designated geographic area" (19 N.Y.C.R.R. § 178.1; *see also* 19 N.Y.C.R.R. § 178.3 [designating what constitutes "residential property"]; 19 N.Y.C.R.R. § 178.4 [addressing "boundary streets"] ). The regulations also enumerate the types of prohibited advertisements, including "letters, postcards, telephone calls, door-to-door calls, handbills, and postings in public areas" (19 N.Y.C.R.R. § 178.1; *see also* 19 N.Y.C.R.R. § 178.5 [list of prohibited solicitations] ).

The regulations establish nonsolicitation areas for the following counties: Queens County (*see* 19 N.Y.C.R.R. § 178.8), Nassau County (*see* 19 N.Y.C.R.R. § 178.9), Kings County (*see* 19 N.Y.C.R.R. § 178.7), and Bronx County (*see* 19 N.Y.C.R.R. § 178.6). In addition, the regulations include a rule preventing realtors from establishing or relocating real estate offices within a nonsolicitation area without prior approval from the Secretary of State (*See* 19 N.Y.C.R.R. § 178.-2).

To determine the constitutionality of the regulations establishing the nonsolicitation orders, the Court will again utilize the *Central Hudson* analysis. As discussed above, the first requirement is that the speech at issue concerns lawful activity and is not misleading. It is undisputed between the parties that the ability of real estate brokers to solicit homeowners constitutes lawful activity and that housing solicitations are not *per se* misleading. Accordingly, the first prong of the *Central Hudson* test is satisfied as to the regulations (*See Greater Baltimore,* 752 F.Supp. at p. 197.

In reviewing the second prong of the test, as it applies to the regulations, the Court considers whether the Secretary of State's interest in enacting the regulations is substantial. As stated by the "Regulatory Impact Statement" issued in conjunction with the rulemaking procedures of the Secretary of State:

*"In some neighborhoods of the State, homeowners have been subjected to intense and repeated solicitation by real estate brokers and salespersons to place their homes for sale with the broker or salesperson.* Sometimes, those solicitations are made with the suggestion or implication that property values in the neighborhood will be decreasing because persons of different ethnic, social or religious backgrounds are moving or are about to move into the neighborhood. This solicitation technique results in a churning of the market, which often generates panic selling. Even if the words are not spoken, the message can be delivered. *The result is an artificial churning of the market, panic selling, depression of property values, and flight from otherwise stable neighborhoods.* In such emotionally charged circumstances, homeowners are pressured to make ill-advised decisions to sell their homes. The collective impact of these individual decisions weakens the economic and social stability of an [sic] neighborhood. By prohibiting solicitations by real estate brokers and salespersons in targeted neighborhoods and communities, these regulations will be an effective tool in combatting the pernicious effects of blockbusting and market churning" (Department of State, Regulatory Impact Statement contained in Notice of Proposed Rulemaking Hearings [annexed to Defendant's Motion as Exhibit A] [emphasis added]).

In fact, the reason for enacting Section 442–h of the Real Property Law was to specifically empower the Secretary of State to enact the nonsolicitation orders. Accordingly, the Court finds that the governmental interest in eliminating the practice of blockbusting is a vital governmental goal (*see Linmark, supra,* 431 U.S. at pp. 94–97, 97 S.Ct. at pp. 1619–20) and therefore the second prong of the *Central Hudson* analysis is satisfied as to the regulations.

■ The third part of the Court's analysis examines whether the regulations directly advance the asserted governmental interest. As more fully set forth above in the discussion of the constitutionality of Section 442–h, the Court was presented with anecdotal evidence of blockbusting activity (*See supra* at

pp. 176–78). In reviewing the totality of the evidence presented in this case, the Court found that there is evidence of blockbusting. Accordingly, the Court finds that the regulations promulgated by the Secretary of State pursuant to Section 442–h furthers the governmental interest of combatting the practice of blockbusting.

■ Having found that the regulations satisfy the first three prongs of the *Central Hudson* analysis, the Court examines whether there is a "fit" between the Secretary of State's goal of combatting blockbusting and the means chosen to accomplish that goal, namely the nonsolicitation regulations (*See Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035).

As an initial matter, the Court recognizes that the definition of a nonsolicitation order, as a direction to realtors to "refrain from soliciting listings for the sale of residential property within a designated geographic area" (19 N.Y.C.R.R. § 178.1), closely tracks the language contained in Section 442–h which authorizes the Secretary of State to issue these types of orders. In addition, the Court finds that the definition of residential property as utilized in the regulations (*see* 19 N.Y.C.R.R. § 178.3), the definition of a "boundary street" (*see* 19 N.Y.C.R.R. § 178.4) as utilized in the description of the geographic scope of the nonsolicitation areas, and the express enumeration of the prohibited forms of solicitation (*see* 19 N.Y.C.R.R. § 178.5), are necessary definitions which enhance the clarity of the regulations. In eliminating vague terms contained within these regulations, the Court finds that the regulations defining a nonsolicitation area are "narrowly tailored" to implement Section 442–h of the Real Property Law and prevent blockbusting (*See Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035).

■ In addressing the actual regulations creating the nonsolicitation areas, the Court examines each nonsolicitation order to determine whether it is "narrowly tailored" to meet the goal of combatting blockbusting in a specific geographic area (*See Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035). Although the Court, once again, recognizes that

the Secretary of State need not implement the least restrictive means to combat block-busting, the Secretary must make an effort to tailor the regulations as narrowly as possible (*See Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035).

Prior to the implementation of the nonsolicitation areas, the Secretary of State held numerous public meetings and compiled extensive data about the geographic areas to be covered by the nonsolicitation orders. The results were compiled by the Department of State and included: (1) population demographics about the various "Community Districts" and towns to be covered by the nonsolicitation orders, (2) information concerning the number of homes on "cease and desist" lists in the areas, and (3) summaries of the public statements made by members of the community (*See* Defendant's Exhibits "L" through "O" annexed to Defendant's Motion for Summary Judgment). The Court already excerpted some relevant portions of the testimony from these public hearings (*See supra* at pp. 176–78).

In addition to the testimony, each report prepared by the Department of State contained data about reported complaints of "heavy improper solicitations" received by the Secretary from residents of various communities. This report also included the number of petitions filed by residents of various communities seeking protection from licensed realtor solicitations because the existing "cease and desist" orders, discussed above, were apparently insufficient. This data for those communities which are part of the nonsolicitation area regulations are as follows:

### Bronx Nonsolicitation Regulation

*Community District 10:*

The Department received nine (9) complaints of heavy or improper solicitation in this district.

### Kings Nonsolicitation Order

I.  *Community District 14:*

There were approximately 1500 petitions for relief from solicitation by residents of this District.

The Department received twelve (12) complaints for alleged heavy or improper solicitation in this district.

II.  *Community District 15:*

There were approximately 650 petitions for relief from solicitation by residents of this District.

III.  *Community District 18:*

There were approximately 3000 petitions for relief from solicitation by residents of this District.

The Department received twenty four (24) complaints for alleged heavy or improper solicitation in this District.

The Department issued two (2) violations for solicitations in this District.

### Queens Nonsolicitation Order

I.  *Community District 3:*

There were approximately 200 petitions for relief from solicitation from residents of East Elmhurst and 300 from residents of Jackson Heights.

The Department received ten (10) complaints relative to alleged improper or heavy solicitation in Jackson Heights, and one (1) relative to East Elmhurst.

The Department issued violations for three (3) solicitations in Jackson Heights and for one (1) in East Elmhurst.

II.  *Community District 4:*

The Department received one (1) complaint relative to an improper solicitation in Elmhurst and approximately fifty (50) in Corona.

III.  *Community District 5:*

There were approximately 900 petitions for relief from solicitation by residents of Glendale; 700 petitions by residents of Maspeth; 500 petitions by residents of Middle Village; and 250 petitions by residents of Ridgewood.

The Department received three (3) complaints relative to improper or heavy solicitation in Maspeth, two (2) relative to

Ridgewood, and two (2) relative to Glendale.

IV. *Community District 6:*

There were approximately 20 petitions for relief from solicitation by residents of Forest Hills and 40 petitions from residents of Rego Park.

V. *Community District 8:*

There were approximately 230 petitions for relief from solicitation by residents of Holliswood and 100 petitions from residents of Jamaica Estates.

The Department received ten (10) complaints relative to alleged improper or heavy solicitation in Jamaica Estates and eighteen (18) relative to Holliswood.

The Department issued violations for three (3) solicitations in Holliswood.

VI. *Community District 9:*

There were approximately 20 petitions for relief from solicitation by residents of Kew Gardens; 1600 petitions from residents of Richmond Hill (part District 9 and part District 10); and 1800 petitions from residents of Woodhaven.

The Department received approximately forty (40) complaints for alleged improper or heavy solicitation in Woodhaven and in excess of ninety five (95) for Richmond Hill.

VII. *Community District 10:*

The Department received fifteen (15) complaints relative to heavy or improper solicitation in Ozone Park and twelve (12) in South Ozone Park.

VIII. *Community District 12:*

There were approximately 170 petitions for relief from solicitation by residents of Hollis; 60 petitions from residents of Jamaica; and 20 from residents of Springfield Gardens (also in District 13).

The Department received seven (7) complaints for alleged heavy or improper solicitation in Jamaica and three (3) in Hollis.

IX. *Community District 13:*

There were approximately 800 petitions for relief from solicitation by residents of Bellerose; 20 petitions form residents of Cambria Heights; 200 petitions from residents of Floral Park; 40 petitions from residents of Laurelton; 500 petitions from residents of Queens Village; and 1400 petitions from residents of Rosedale.

The Department received approximately fifteen (15) complaints for alleged improper or heavy solicitation in Queens Village, three (3) in Bellrose, five (5) in Floral Park, seven (7) in Rosedale, and four (4) in Cambria Heights.

X. *Community District 14:*

There were approximately 185 petitions for relief from solicitation by residents of Arverne; 35 petitions from residents of Edgemere; and 650 petitions from residents of Far Rockaway.

The Department received four (4) complaints for heavy or improper solicitation in Far Rockaway, and has issued one (1) violation for a solicitation in Far Rockaway.

### *Nassau Nonsolicitation Order*

*Town of Elmont:*

There were approximately 1800 petitions for relief from solicitation by residents of Elmont.

The Department received at least twenty (20) complaints relative to alleged improper or heavy solicitation in Elmont.

The Department issued violations relative to two (2) solicitations in Elmont.

Upon the Court's review of the totality of the circumstances as to the nonsolicitation orders, including geographic scope, the Court finds that the regulations are more narrowly tailored than those involved in *Discovery Network*. In *Discovery Network*, all "commercial handbills" were permanently prevented from being distributed in newsracks throughout the entire city. There was neither a finding by the City of Cincinatti with respect to the type of publication to be considered "commercial handbills", nor a finding with respect to the geographic scope of the

prohibition (*See Discovery Network, supra,* —— U.S. at pp. ——–——, 113 S.Ct. at pp. 1508–09). In the present case, the Secretary of State had information from which to reasonably conclude that the residents of certain geographic areas were subjected to blockbusting tactics and the nonsolicitation orders were limited to those specific geographic areas were there was substantial evidence of blockbusting. Accordingly, the Court finds that the 19 N.Y.C.R.R. §§ 178.6–178.9 regulations are more "narrowly tailored" than the statute in *Discovery Network.*

In addition, these regulations are unlike the statute at issue in *Fane* which restricted the in-person solicitation of all certified public accountants (*See Fane, supra,* —— U.S. at p. ——, 113 S.Ct. at p. 1796). In *Fane* there was no requirement that the Board of Accountancy make an express finding that there were improper solicitations by CPAs in a specific region prior to implementing the solicitation restrictions. In the present case, the Secretary of State had information from which to reasonably conclude that the residents of the geographic areas covered by the orders were subjected to heavy blockbusting. Accordingly, the Court finds that 19 N.Y.C.R.R. §§ 178.6–178.9 regulations are more "narrowly tailored" than the statute in *Fane.*

In addressing a constitutional challenge to a nonsolicitation order issued for a portion of Queens, the New York State Appellate Division stated:

"The only serious issue is whether the goal of preventing racial blockbusting could have been served equally well by an order less restrictive of commercial speech.

The order was restricted to a limited portion of Queens County where it was established that excessive personal solicitation and harassment of homeowners by real estate brokers had caused racial blockbusting to become a serious threat to the community ... *Any* further solicitation by brokers in these limited areas would have the undesirable effect of perpetuating the fear and panic which their prior activities had created. Thus, no order which did not prohibit *all* solicitation could serve equally well the purpose of preventing racial blockbusting. Consequently, the 1973 nonsolicitation order meets the constitutional test for regulation of commercial speech" (*Cohen v. Shaffer,* 118 A.D.2d 643, 499 N.Y.S.2d 797, 798–99 [2d Dep't 1986] ).

It was based upon the determination that the nonsolicitation order was for a "limited area" in which it was "established that excessive personal solicitation and harassment of homeowners by real estate brokers has caused racial blockbusting" that the Appellate Division determined that the nonsolicitation order was constitutionally permissible (*See Cohen, supra,* 499 N.Y.S.2d at pp. 798–99).

Additionally, in the present case, unlike the facts in *Discovery Network* and *Fane,* the nonsolicitation orders at issue in this case have an express duration of five (5) years and are scheduled to expire on April 15, 1996 (*See* 19 N.Y.C.R.R. §§ 178.6[c], 178.7[c], 178.8[c], 178.9[c] ["This section shall expire five years after the effective date"] ). After the expiration of this finite nonsolicitation order, the Secretary of State must once again conduct hearings and make the Section 442–h determinations in order to implement new nonsolicitation orders.

In another regulation designed to combat blockbusting, the New York Secretary of State promulgated a regulation closely akin to the federal and state blockbusting statutes. This regulation prevents a broker from "making any representation regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion or national origin" in conjunction with selling, leasing, or listing real estate properties (19 N.Y.C.R.R. § 175.-17[a] ).

The plaintiffs seek to have this regulation declared unconstitutional, "only 'as applied' by defendant to truthful and non-misleading communications by real estate licensees which does not make a representation regarding the entry or prospective entry into the neighborhood of persons of a particular race, color, religion or national origin" (Notice of Motion, dated February 22, 1993, at p. 2). Since the plain language of the regulation does not address communications "which [do] not make a representation regarding the

entry or prospective entry into the neighborhood or persons of a particular race, color, religion or national origin", such a determination by this Court is redundant and unnecessary (*See Himes v. Shalala,* 999 F.2d 684, 688–89 (2d Cir.1993) [a review of an agency's interpretation of a statute starts with an analysis of the plain language] ). Therefore, the plaintiff's motion to declare 19 N.Y.C.R.R. § 175.17[a] unconstitutional, as applied, is denied.

It is based upon the above determinations, that the Court finds that 19 N.Y.C.R.R. §§ 178.1–178.9, and 175.17[a] are sufficiently "narrowly tailored" to achieve the desired objective of preventing blockbusting (*see Fox, supra,* 492 U.S. at p. 480, 109 S.Ct. at p. 3035). Since all of these regulations satisfy the *Central Hudson* analysis, they are constitutionally permissible restrictions on commercial speech.

### Privileges & Immunities Clause:

Count Two of the complaint alleges a violation of the privileges and immunities clause of the Constitution. The privileges and immunities clause of the Constitution states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens of the several States" (U.S. Const. art. IV, § 2, cl. 1). The Supreme Court has stated that "[t]he constitutional right to travel from one State to another ... occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized" (*Shapiro v. Thompson,* 394 U.S. 618, 630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 [1969] ).

Also, the Second Circuit has stated that "[m]erely having an effect on travel is not sufficient to raise an issue of constitutional dimension ... [r]ather, a statute implicates the constitutional right to travel when it actually deters such travel ... or when impedance of travel is its primary objective" (*Soto–Lopez v. New York City Civil Service Comm'n,* 755 F.2d 266, 278–79 [2d Cir.1985], *aff'd sub nom. Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 903, 106 S.Ct. 2317, 2321, 90 L.Ed.2d 899 [1986] ["a] state law implicates the right to travel ... when impeding travel is its primary objec-

tive, ... or when it uses ' "any classification which serves to penalize the exercise of that right" ' " (citations omitted) ]; *see also ITC Entertainment, ·Ltd. v. Nelson Film Partners,* 714 F.2d 217, 222–23 [2d Cir.1983] ).

In this case, the defendant asserts that the statute and regulations at issue do not implicate the constitutional right to travel within the meaning of the privileges and immunities clause of the Constitution and moves for summary judgment dismissing that count. It appears to the Court that the only potential claim based upon the interstate privileges and immunities clause is based upon a portion of Section 442–h and 19 N.Y.C.R.R. § 178.2 which requires authorization from the Secretary of State prior to establishing or relocating a real estate office within a nonsolicitation area.

Section 442–h[2][b] states that:

"No real estate broker shall establish a new principal office or branch office within any geographic area which is the subject of a nonsolicitation order without prior approval from the secretary of state. The secretary of state may deny any application for the establishment or relocation of a principal office or branch office if approval of the application would cause the total number of principal and branch offices within the subject area to exceed the total number of principal and branch offices that were licensed within the area on the date the nonsolicitation order became effective" (N.Y.Real Prop.Law § 442–h[2][b] ).

It is based upon this express statutory authorization that the Secretary of State issued a regulation that states, in relevant part, that "[n]o real estate broker shall establish or relocate a principal office or branch office within a nonsolicitation area without prior written approval of the Secretary of State" (19 N.Y.C.R.R. § 178.2).

In addressing this claim by the plaintiff, the Court first notes that neither the statute nor the regulation limits the right to travel between states and therefore does not trigger the interstate privileges and immunities clause of the constitution (*Shapiro, supra,* 394 U.S. at p. 630, 89 S.Ct. at p. 1329). In addition, even if the statute and regulation

did implicate interstate travel, it is clear to the Court, as a matter of law, that the statute and regulation does not have as a "primary objective," the impeding of travel which would trigger the interstate privileges and immunities clause (*See Soto–Lopez, supra,* 755 F.2d at pp. 278–79). Accordingly, the defendant's motion for summary judgment dismissing Count Two of the Complaint is granted.

### *Equal Protection:*

██ The third count of the complaint alleges a violation of the equal protection clause of the Constitution. According to the Second Circuit's interpretation of Supreme Court precedent,

"[i]n the area of economic or social welfare, legislation not involving suspect classifications or touching on fundamental interests is presumed constitutional, and the courts require only that the distinctions drawn by the challenged statute be *rationally related to a legitimate state interest or purpose* " (*Gronne v. Abrams,* 793 F.2d 74, 77 [2d Cir.1986] [emphasis added] ).

The Supreme Court has clearly stated that the right to housing is not a fundamental interest and accordingly a statute governing dwellings need only be rationally related to the legitimate governmental interest (*See Lindsey v. Normet,* 405 U.S. 56, 73–74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 [1972] ).

It has been further recognized that "[t]he Equal Protection Clause protects people, *not places* ... [and] [s]o long as all persons within the jurisdictional reach of the statute are equally affected by the law, it matters not that those outside the territorial reach of the law are free to behave differently" (*Reeder v. Kansas City Board of Police Comm'rs,* 796 F.2d 1050, 1053 [8th Cir.1986], *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 [1987] [emphasis added] [*citing McGowan v. Maryland,* 366 U.S. 420, 427, 81 S.Ct. 1101, 1106, 6 L.Ed.2d 393 (1961) ] ).

In the present case, all real estate brokers and salespersons acting within the nonsolicitation areas must refrain from activities prohibited by Section 442–h and the regulations. Likewise, all real estate brokers and salespersons conducting business outside the non-solicitation areas are not limited by the nonsolicitation orders. Since all real estate brokers and salespersons within the reach of the nonsolicitation orders are treated equally, there is no equal protection violation (*See Reeder, supra,* 796 F.2d at p. 1053). Accordingly, the defendant's motion for summary judgment dismissing the third count of the complaint is granted.

### *Qualified Immunity:*

██ The defendant moves for summary judgment dismissing the complaint based upon the defense of qualified immunity. The Second Circuit established that "government officials are immune from liability for alleged constitutional violations if the claims do not allege violations of law which were 'clearly established at the time an action occurred" (*Easton v. Sundram,* 947 F.2d 1011, 1015 [2d Cir.1991], *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 [1992] [*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 [1982] ). Qualified immunity protects "a government official performing discretionary functions from liability to the extent that his 'conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known' " (*Id.* [*quoting Harlow, supra,* 457 U.S. at p. 818, 102 S.Ct. at p. 2738] [emphasis added] ).

However, the qualified immunity defense is only available in situations where the official is seeking to be shielded from monetary damages (*See Benitez v. Wolff,* 985 F.2d 662, 666 [2d Cir.1993] ["shields state officials from liability for damages"] ). Here, the plaintiff is not seeking monetary damages and therefore the defense of qualified immunity is not available to the defendant.

### *Fair Housing Act:*

██ The fourth count in the complaint alleges a violation of the Fair Housing Act. The Second Circuit has stated that to establish a prima facie case under the Fair Housing Act, the plaintiff must establish "that the challenged practice of the defendant 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect' ... The plaintiff need not show that the decision complained of was made with

discriminatory intent" (*Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 [2d Cir.], *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 [1988] [citations omitted] ).

It appears to this Court to be incongruous that the plaintiffs, in their first count, allege that the nonsolicitation orders, designed to prevent blockbusting, infringe upon protected commercial speech and then in the fourth count, allege that the nonsolicitation orders foster blockbusting. Despite the plaintiffs' assertions, the Court determines that, as a matter of law, the nonsolicitation orders do not violate the Fair Housing Act. As discussed above, the statute and nonsolicitation orders were specifically enacted to prevent racial discrimination in housing (*See Huntington Branch, supra,* 844 F.2d at p. 934).

Accordingly, the motion by the defendant for summary judgment dismissing the fourth count of the complaint is granted.

### 42 U.S.C. §§ 1981, 1982:

■ The fifth count contained in the complaint alleges claims based on 42 U.S.C. §§ 1981, 1982. Section 1981 states, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same rights in every State and Territory ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" (42 U.S.C. § 1981[a] ). Section 1982 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property" (42 U.S.C. § 1982).

The defendant moves for summary judgment dismissing this claim by asserting that the statute and regulations do not discriminate between white and non-white persons. In evaluating this claim, the Court finds, as a matter of law, that there is no evidence that the defendant violated 42 U.S.C. §§ 1981 or 1982 by differentiating between white non-white citizens within the non-solicitation zones established by the statute and regulations at issue in this case. Accordingly, the motion by the defendant for summary judg-

ment dismissing the fifth count in the complaint is granted.

### 42 U.S.C. § 1983:

■ The sixth count in the complaint asserts a claim pursuant to 42 U.S.C. § 1983. Section 1983 states, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States.... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress" (*Id.*). A violation is proven when "a person or persons acting under color of state law deprived a plaintiff of rights, privileges, or immunities secured by the constitution or laws of the United States (*McDarby v. Dinkins,* 907 F.2d 1334, 1336 [2d Cir.1990] [*citing Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 [1981]; *see also Kraebel v. New York City Dep't of Housing Preservation & Development,* 959 F.2d 395, 404 [2d Cir.], *cert. denied,* —— U.S. ——, 113 S.Ct. 326, 121 L.Ed.2d 245 [1992] ).

In the present case, as discussed fully above the plaintiff failed to establish that the defendant deprived the plaintiffs of any constitutional rights which would entitle the plaintiffs to recover pursuant to 42 U.S.C. § 1983. Accordingly, the motion by the defendant for summary judgment dismissing the Section 1983 portion of the sixth count of the complaint is granted.

### Attorney's Fees:

■ The sixth count of the complaint also seeks attorneys fees for the prevailing plaintiff pursuant to 42 U.S.C. § 1988. In addressing the ability of a prevailing plaintiff in a civil rights action to recover attorney's fees, the Supreme Court stated that

"to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought ... [and] [w]hatever relief the plaintiff secures must directly benefit him at the time of judgment ... Otherwise

the judgment ... cannot be said to 'affec[t] the behavior of the defendant toward the plaintiff'" (*Farrar v. Hobby*, —— U.S. ——, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 [1992]).

In this case, the Court found that the statute and regulations at issue were not unconstitutional and there was no statutory violation by the defendant. Therefore, there is no "material alteration of the legal relationship of the parties" (*See Farrar, supra*, —— U.S. at p. ——, 113 S.Ct. at p. 573) and the plaintiffs are not entitled to attorney's fees. Accordingly, the motion for summary judgment dismissing the attorney's fees portion of the sixth count of the complaint is granted.

*Injunction:*

The plaintiff also seeks an injunction preventing the defendant from enforcing the statute and regulations at issue in this case. It is established law in the Second Circuit that the "historical commitment to expressive liberties dictates that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'" (*Paulsen v. County of Nassau*, 925 F.2d 65, 68 [2d Cir.1991] [*quoting Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976)]). However, since the Court finds that New York Real Property Law Section 442–h and the regulations promulgated pursuant to that statute are not unconstitutional and are not violative of the First Amendment, the motion for an injunction preventing the defendant from enforcing those provisions is denied.

### CONCLUSIONS

Based upon the foregoing, the Court makes the following rulings:

1) The plaintiff's motion for summary judgment pursuant to Fed.R.Civ.P. 56 is denied as to the first, second, third, fourth, fifth, and sixth counts;

2) The defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing the first, second, third, fourth, fifth, and sixth counts is granted;

3) The plaintiff's motion for an injunction preventing the defendant from enforcing

New York Real Property Law Section 442–h and the regulations at issue in this action which were promulgated thereunder is denied.

The Clerk of the Court is advised this decision closes the case.

**SO ORDERED.**