**ANHEUSER–BUSCH, INC. and Penn Advertising of Baltimore, Inc., Plaintiffs,**

**v.**

**MAYOR AND CITY COUNCIL OF BALTIMORE CITY, et al., Defendants.**

**Civ. A. Nos. HAR 94–117, HAR 94–145.**

United States District Court, D. Maryland.

March 28, 1994.

Thomas M. Wood (Neuberger, Quinn, et al.) Baltimore, MD.

John J. Walsh (Cadwalader, Wiskersham & Taft), Mary E. Taylor, Steven G. Brody, New York City, for plaintiff or petitioner.

Burton H. Levin (Office of the City Solicitor), Sandra R. Gutman, Baltimore, MD, for defendant or respondent.

## MEMORANDUM OPINION

HARGROVE, District Judge.

Plaintiffs Anheuser–Busch, Inc. ("Anheuser–Busch") and Penn Advertising of Baltimore, Inc. ("Penn Advertising") have each brought suit for declaratory and injunctive relief against defendants Mayor and City Council of Baltimore City (the municipal corporation), Kurt L. Schmoke (and his successors as the Mayor of Baltimore City), the City Council of Baltimore City, and David Tanner (and his successors as General Superintendent of Zoning Administration and Enforcement), (hereinafter collectively referred to as "the City"). Anheuser–Busch and Penn Advertising challenge Article 30, Section 10.0–1H and Article 30, Section 11.0–7 of the Baltimore City Code, as promulgated by Bill No. 626 (hereinafter collectively referred to as "the Advertising Ban" or "the Ordinance"), as violating the First Amendment to the Constitution of the United States and Article 40 of the Declaration of Rights of the Maryland Constitution. The Court consolidated the two separate actions on the record in open court in light of their common questions of law and fact. Fed.R.Civ.P. 42(a).

Presently before the Court is a Motion for Preliminary Injunction brought by Anheuser–Busch and Penn Advertising, and a Motion to Dismiss submitted by the City. Because the Court has considered matters outside of the pleadings, the Court will treat the Motion to Dismiss as a Motion for Summary Judgment under Rule 56. Fed.R.Civ.P. 12(b). Having reviewed the parties' memoranda and exhibits, and heard oral argument on the motions, this Court holds that the Ordinance does not violate the First Amendment or Article 40 for the reasons set forth in this memorandum opinion.

### FACTS

On May 27, 1993, the Maryland legislature amended Section 222 of the Alcoholic Beverage Statute ("the Maryland Statute") to delegate to the Mayor and City Council of Baltimore the authority to adopt an ordinance restricting outdoor advertisements of alcoholic beverages in Baltimore City if the Mayor and City Council determine the ordinance is

"necessary for the promotion of the welfare and temperance of minors." Md. Alco.Bev.Code Ann. §§ 222 and 222(c) (1993). The Maryland Statute exempts from regulation neon or other electric signs in the windows of premises licensed to sell alcohol, signs on MTA vehicles and taxicabs, signs on commercial vehicles used for transporting alcoholic beverages, signs at Memorial Stadium and any property owned, leased or operated by the Maryland Stadium Authority, and signs on property next to interstate highways. Md.Alco.Bev.Code Ann. § 222(c)(2).

Pursuant to its authority under the Maryland Statute, the City enacted the Ordinance on January 6, 1994, which bans, with certain exceptions, the display or advertisement of alcoholic beverages on billboards in publicly visible locations. The Ordinance contains a lengthy Preamble in which the City describes the problem of underage drinking in the City and asserts that such regulation is necessary to promote the welfare and temperance of minors exposed to such advertisements. The City Council enacted the Ordinance after holding a public hearing on the issue on November 17, 1993, at which private citizens, public officials, experts on advertising, legal scholars, and representatives of Anheuser–Busch and Penn Advertising testified.

Prior to the date the Ordinance took effect, Anheuser–Busch and Penn Advertising brought suit alleging that the Ordinance is unconstitutional.

## DISCUSSION [1]

Summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering the City's motion, the Court views the underlying facts and all reasonable inferences drawn

therefrom in the light most favorable to the parties opposing summary judgment. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

While the First Amendment [2] guards against unwarranted infringements on commercial speech, it is a well settled principle that "commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).

The Supreme Court in *Central Hudson* set forth the test for assessing the constitutionality of restrictions on commercial speech:

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980).

In this case, the parties concur that the advertising at issue is not unlawful or misleading, and that the City's interest in promoting the welfare and temperance of minors is substantial, thereby satisfying the first and second prongs of the *Central Hudson* test. The parties dispute at length whether the

---

1. Because this Court is prepared to rule on whether the Ordinance violates the First Amendment, the Motion for a Preliminary Injunction is moot. Therefore, this memorandum opinion will focus on the Motion to Dismiss.

2. The limits on governmental restrictions of speech contained in Article 40 of the Maryland Declaration of Rights are identical to those set

forth in the First Amendment. *Freedman v. State*, 233 Md. 498, 197 A.2d 232 (1964), *rev'd on other grounds*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Therefore, although this memorandum opinion focuses on the First Amendment challenge, the holding of this Court applies equally to Article 40.

Ordinance complies with the third and fourth prongs of the test.[3]

*Direct Advancement*

In *Edenfield v. Fane,* —— U.S. ——, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), the Supreme Court revisited the *Central Hudson* test for commercial speech and concluded that to withstand a First Amendment challenge, the state must demonstrate that "its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Id.* at ——, 113 S.Ct. at 1799. The Supreme Court cautioned that mere assertion that a regulation directly advances an asserted interest is insufficient to justify it. Under the *Central Hudson* test, "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Id.* at ——, 113 S.Ct. at 1800.

In *Edenfield,* a Certified Public Accountant ("CPA") challenged a Florida ban on in-person solicitation by CPAs, promulgated by the Florida Board of Accountancy, as a violation of his rights under the First and Fourteenth Amendments. In striking down the prohibition, the Supreme Court recognized the substantial governmental interest in protecting consumers from fraud or overreaching by CPAs and in maintaining CPA independence in performing their professional duties. However, the Court held that the Florida Board had failed to demonstrate that the ban against solicitation "advance[d] its asserted interests in any direct and material way." *Id.* at ——, 113 S.Ct. at 1800.

In invalidating the restriction, the Supreme Court focused on the Board's failure to present any studies, anecdotal evidence, or individual conduct to support its contention that the ban was necessary to prevent the alleged harm that personal solicitation by CPAs created. The only evidence that the Board presented to support the need for its regulation was an affidavit by a former Chairman of the Florida Board that concluded that the solicitation ban was necessary. In evaluating the Board's proffered evidence, however, the Supreme Court discounted the affidavit, which "contain[ed] nothing more than a series of conclusory statements that add little if anything to the Board's original statement of its justifications." *Id.* at ——, 113 S.Ct. at 1800–01. The Court also reviewed a report on CPA solicitation and literature on the accounting profession, which contradicted the Board's concern. *Id.* at ——, 113 S.Ct. at 1801.

The City maintains that *Edenfield* does not modify the deference that this Court should afford the legislature under *Central Hudson* when evaluating restrictions on commercial speech. In repeated litigation over the constitutionality of ordinances that restrict the placement of billboards, the Supreme Court has deferred to a legislative judgment that a link exists between billboards and traffic safety. In *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), for example, the Supreme Court upheld San Diego's ban on off-site billboard advertising under the *Central Hudson* test. Although the record failed to establish a connection between billboards and traffic safety, the Court nonetheless upheld the restriction, reasoning: "We likewise hesitate to disagree with the accumulated, commonsense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety. There is nothing here to suggest that these judgments are unreasonable." *Id.* at 509, 101 S.Ct. at 2893 (footnote omitted).

The City urges this Court to follow the Fifth and Tenth Circuits in deferring to a legislative judgment that a link exists between alcohol advertising and consumption when evaluating the Ordinance under *Cen-*

---

**3.** The City contends that as an exercise of the State's plenary power to regulate the sale of alcohol pursuant to the Twenty-first Amendment, the Ordinance is valid if rationally related to a legitimate government interest. Alternatively, the City asserts that the Ordinance passes the more stringent test for restrictions on commer- cial speech enunciated in *Central Hudson,* 447 U.S. 557, 100 S.Ct. 2343. Because the Ordinance complies with the *Central Hudson* test, an examination of the interplay between the Twenty-first Amendment and restrictions on commercial speech is unnecessary.

*tral Hudson.* Prior to *Edenfield,* the Fifth Circuit upheld a Mississippi law banning liquor advertising by local, in-state media despite the absence of concrete data to support such a link in *Dunagin v. Oxford,* 718 F.2d 738 (5th Cir.1983), *cert. den.,* 467 U.S. 1259, 104 S.Ct. 3554, 3555, 82 L.Ed.2d 855 (1984): "Whether we characterize our disposition as following the judicial notice approach taken in *Central Hudson Gas,* or following the 'accumulated, common-sense judgment' approach taken in *Metromedia,* we hold that sufficient reason exists to believe that advertising and consumption are linked to justify the ban, whether or not 'concrete scientific evidence' exists to that effect." *Id.* at 750.

In *Oklahoma Telecasters Association v. Crisp,* 699 F.2d 490 (10th Cir.1983), *rev'd on other grounds sub nom., Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), the Tenth Circuit likewise deferred to a legislative judgment linking alcohol advertising and consumption in upholding a prohibition against the broadcasting of advertisements for alcoholic beverages. The Tenth Circuit relied on the plurality's language in *Metromedia* and a lesser standard of review under the Twenty-first Amendment[4] to hold "as a matter of law, that prohibitions against the advertising of alcoholic beverages are reasonably related to reducing the sale and consumption of those beverages and their attendant problems." *Id.* at 501.

Anheuser–Busch and Penn Advertising contend that the City's continued reliance on the earlier cases of *Dunagin* and *Crisp,* in light of the Supreme Court's recent decision in *Edenfield,* are misplaced. Instructed by the Supreme Court that absolute deference to a legislative judgment is no longer appropriate when regulating commercial speech, Anheuser–Busch and Penn Advertising argue that the City must demonstrate that the. Advertising Ban will reduce underage drinking in a direct and material way in order to withstand constitutional scrutiny. According to Anheuser–Busch, "*Edenfield* requires the judiciary to undertake a thorough and searching evaluation of a legislature's self-serving or presumed conclusion that its pro-

posed restriction on commercial speech will directly advance a substantial government interest. [— U.S. at ——] 113 S.Ct. at 1800." Memorandum of Law in Support of Motion for Preliminary Injunction, pp. 22–23. Anheuser–Busch and Penn Advertising contend that *Edenfield* requires this Court to conduct a hearing and allow the parties to develop a more extensive record before the Court may rule on the constitutionality of the Ordinance.

■ This Court, however, is unable to find any language in *Edenfield* that specifies the precise level of scrutiny with which this Court must review the Ordinance. *Edenfield* requires only that the government "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." — U.S. at ——, 113 S.Ct. at 1800. The opinion does not contain any reference to an evidentiary hearing. This Court has reviewed the numerous exhibits submitted by all parties, which are part of the record in this case. At the motions hearing, the parties were unable to persuasively articulate the benefit that an evidentiary hearing would bring to resolution of this case. Therefore, in light of the extensive record that the parties have already established in this case, this Court concludes that an evidentiary hearing is not necessary.

Shortly after the Supreme Court issued its decision in *Edenfield,* it affirmed the role of judicial deference to legislative judgments in the area of commercial speech. In *U.S. v. Edge Broadcasting Co.,* — U.S. ——, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993), Edge, the owner and operator of a North Carolina radio station, challenged a federal statute that prohibited radio broadcast of lottery advertising by licensees located in nonlottery states as a violation of the First Amendment. Congress has enacted the federal statute to assist States in controlling this form of gambling. Since Edge broadcasted from near the Virginia–North Carolina border, 90% of his listeners were in Virginia, which sponsors a lottery. Edge's remaining listeners were in North Carolina, a nonlottery state. Seeking to broadcast Virginia lottery advertise-

---

**4.** *See* note 3, *supra.*

ments, Edge brought suit alleging that the statute, as applied to him, violated the First Amendment.

In assessing the restriction under *Central Hudson,* the Supreme Court found that the exclusion of gambling advertisements from 11% of the radio listening time in the area directly served North Carolina's interest in upholding its ban on gambling. *Id.* at ——, 113 S.Ct. at 2706. The Court rejected the broadcaster's argument that the regulation's failure to shield North Carolina residents from all advertising and information on lotteries rendered it ineffective. The Court acknowledged the propriety of a legislative judgment that advertising increases consumption, and the judicial deference that such a judgment warrants:

> Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments. Here, as in *Posadas de Puerto Rico,* the Government obviously legislated on the premise that the advertising of gambling serves to increase the demand for the advertised product. Congress clearly was entitled to determine that broadcast of promotional advertising of lotteries undermines North Carolina's policy against gambling, even if the North Carolina audience is not wholly unaware of the lottery's existence. Congress has, for example, altogether banned the broadcast advertising of cigarettes, even though it could hardly have believed that this regulation would keep the public wholly ignorant of the availability of cigarettes.

*Id.* at ——, 113 S.Ct. at 2707 (citations omitted).

The handful of lower courts that have considered the impact of the recent Supreme Court decisions involving commercial speech on *Central Hudson* have recognized a legislative judgment that advertising increases consumption. In *Cal–Almond, Inc. v. U.S. Department of Agriculture,* 14 F.3d 429 (9th Cir.1993), almond handlers challenged the collection of assessments by the California Almond Board to conduct general almond advertising. In discussing the validity of the assessment-funded almond promotion program, the Ninth Circuit adhered to the judicial recognition that a link exists between advertising and consumption. Despite *Edenfield*'s general instruction to evaluate the government's interests and the harms it seeks to avoid, the Ninth Circuit noted: "[t]he Supreme Court assumes as a matter of law that advertising increases consumption of the product or service being advertised ... Therefore, we may reasonably assume that the Board's promotional efforts have some positive effect on almond demand." *Id.* at 439 (citations omitted).

In *New York State Association of Realtors v. Shaffer,* 833 F.Supp. 165 (E.D.N.Y.1993), an association of real estate brokers sought a declaratory judgment that a statute authorizing the Secretary of State to issue "nonsolicitation" orders, which prevented real estate brokers from directly soliciting clients, was unconstitutional. The asserted purpose of the nonsolicitation orders was to prevent "blockbusting," where individuals prey on the fears of property owners in racially transitional areas, thereby producing panic selling and instability in the community. The Eastern District of New York granted summary judgment to defendants, holding that the statute and attendant regulations did not violate the First Amendment.

In determining whether the regulation directly advanced the government's asserted interest, the District Court reviewed the *Edenfield* opinion for guidance. The District Court focused on the Supreme Court's search for any studies, anecdotal evidence, or individual conduct in *Edenfield* to demonstrate the alleged harm that accountant solicitation created. *Id.* at 179. Although New York failed to present extensive studies to show the existence of the harm it sought to regulate, the District Court held in *Shaffer* that generalized anecdotal evidence of the evil that blockbusting presented satisfied the third prong of *Central Hudson:* "In reviewing the totality of the evidence presented in this case, the Court finds that there is sufficient evidence of blockbusting. Accordingly, the Court finds that Section 442–h furthers the governmental interest of combatting the invidious practice of blockbusting." *Id. Shaffer* thus differed from *Edenfield* in that the court found evidence of the harm that

blockbusting created in the former, while no comparable evidence of the alleged harm flowing from CPA solicitation existed in the latter. Like defendants in *Shaffer*, the City has presented extensive evidence of the harm that underage drinking presents in Baltimore City.

In support of its contention that *Edenfield* requires a more searching inquiry than previously had been required, Anheuser–Busch and Penn Advertising cite two recent cases that invalidated advertising restrictions on alcohol after a hearing. In *Adolph Coors Co. v. Bentsen*, 2 F.3d 355 (10th Cir.1993), the Tenth Circuit held that a regulation prohibiting statements of alcohol content on malt beverage labels violated the First Amendment. The government contended that the purpose of the regulation was to prevent strength wars among competing manufacturers. In invalidating the regulation, the court noted: "[t]he critical question is whether the evidence shows the required relationship between the labeling prohibition that Coors is challenging and the threat of strength wars." *Id.* at 358.

In *Coors*, the government relied primarily on anecdotal evidence that manufacturers were already competing and advertising on the basis of alcohol strength. However, the government failed to provide any evidence to show that factual statements of alcohol content contributed to these strength wars, rather than the more descriptive terms used to advertise alcohol strength. Also, the government presented no evidence to indicate that strength wars existed where alcohol content labeling was required. The Tenth Circuit thus concluded that "the Government has offered no evidence to indicate that the appearance of factual statements of alcohol content on malt beverage labels would lead to strength wars or that their continued prohibition helps to prevent strength wars. Instead, it has offered only inferential arguments that are based on mere speculation and conjecture and fails to show that the prohibition advances the Government's interest in a direct and material way." *Id.* at 359.

In *44 Liquor Mart v. Racine*, 829 F.Supp. 543 (D.R.I.1993), the Rhode Island District Court struck down a state statute prohibiting off-premises price advertisements of alcoholic beverages because the state had failed to establish that the ban on price advertisements directly advanced its interest in reducing alcohol consumption. After evaluating the expert testimony and research results, the court concluded that the ban on price advertisements had no significant impact on alcohol consumption in the state.

The District Court in *44 Liquor Mart* repeatedly distinguished between a restriction on price advertising and a general ban on alcohol advertising, the Ordinance at issue in this case. Although the court referenced the Supreme Court's recognition in *Edge* that an immediate connection exists between advertising and demand in lottery gambling, it noted that "the regulations at issue in this case make no attempt to reduce the amount of alcohol advertising, but merely proscribe the dissemination of truthful price information." 829 F.Supp. at 553 n. 10. The court twice declined to rule on the constitutionality of a total or partial ban on alcohol advertising. *Id.* at 549 n. 6 and 553 n. 10.

*Coors* and *44 Liquor Mart* thus differ from the instant case with respect to the type of link between the regulation and the asserted governmental interest. A link between statements of alcohol content and strength wars, or between price advertisements and alcohol consumption is, at best, tenuous. Although advertisements of alcohol content or price may influence the particular brand that a consumer chooses, they are unlikely to persuade one who does not otherwise consume alcoholic beverages to indulge. In contrast, a link between general advertising and overall consumption is more immediately apparent. *See, e.g., Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 342, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986) ("We think [that] the legislature's belief [that advertising of casino gambling would serve to increase the demand for the product advertised] is a reasonable one"); *Central Hudson*, 447 U.S. at 569, 100 S.Ct. at 2353 ("[t]here is an immediate connection between advertising and demand for electricity.")

The Supreme Court and the Ninth Circuit have affirmed the propriety of deferring to a

legislative judgment that a causal connection exists between advertisements and alcohol consumption even after *Edenfield. See Edge,* ── U.S. at ──, 113 S.Ct. at 2707; *Cal–Almond,* 14 F.3d at 439–40. Moreover, the District Court in *44 Liquor Mart* repeatedly distinguished its case from those where a link between advertising and consumption was self-evident, the exact scenario present in this case:

> Unlike a number of cases in the commercial speech area, the link between alcohol price advertising and increased per-capita consumption is not self-evident. *See, e.g., Posadas,* 478 U.S. at 341–42, 106 S.Ct. at 2976–77 (link between ban on gambling advertising and level of gambling self-evident); *Central Hudson,* 447 U.S. at 569, 100 S.Ct. at 2353 (link between advertising ban and sales self-evident); *Dunagin v. Oxford,* 718 F.2d at 747–49 & n. 8 (link between overall advertising and increased alcohol use deemed self-evident).

829 F.Supp. at 554.

■ In fact, the City has exceeded the required level of proof under *Central Hudson* by submitting further evidence in support of the Ordinance. Despite the judicially recognized "self-evident" proposition that advertising increases consumption, and the deference that a legislative judgment to that effect warrants, the City has submitted various studies that establish a connection between alcohol advertising and adolescents' attitudes toward alcohol, and between alcohol advertising and consumption. The City Council, an elected legislative body, also conducted a public hearing on the Ordinance prior to its enactment at which several private citizens, public officials, experts in advertising, attorneys, and representatives of Anheuser–Busch and Penn Advertising spoke.

In response, Anheuser–Busch and Penn Advertising have submitted various studies that refute the existence of a connection between alcohol advertising and consumption among adults or adolescents, and critiques of the studies that show an affirmative link between advertising and consumption. Anheuser–Busch maintains that the purpose of its advertising is not to increase overall consumption, but merely to increase its market share of a constant pool of those who have already decided to consume alcohol. Castellano Aff. ¶ 20. As the Fifth Circuit aptly stated in *Dunagin,* however:

> It is beyond our ability to understand why huge sums of money would be devoted to the promotion of sales of liquor without expected results, or continue without realized results. No doubt competitors want to retain and expand their share of the market, but what businessperson stops short with competitive comparisons? It is total sales, profits, that pay the advertiser; and dollars go into advertising only if they produce sales. Money talks: it talks to the young and the old about what counts in the marketplace of our society.

718 F.2d at 749.

In light of the Supreme Court's continued deference to a legislative judgment that advertising increases consumption, even after *Edenfield,* this Court finds that the Ordinance directly advances the City's asserted interest in promoting the welfare and temperance of minors.

*Narrowly Tailored*

In *Board of Trustees v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the Supreme Court explained that the fourth prong in the *Central Hudson* test requires only that the regulation be reasonable to withstand constitutional scrutiny:

> What our decisions require is a "fit" between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but, ... a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.

*Id.* at 480, 109 S.Ct. at 3035 (internal quotations and citations omitted).

■ In declining to impose a "least restrictive means" requirement, the Supreme

Court acknowledged in *Fox* "the difficulty of establishing with precision that point at which restrictions become more extensive than their objective requires, and provide the Legislative and Executive Branches needed leeway in a field (commercial speech) 'traditionally subject to governmental regulation,'" *Id.* at 481, 109 S.Ct. at 3035 (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. at 455–56, 98 S.Ct. at 1918).[5] An intermediate level of scrutiny thus recognizes the latitude that decisionmakers require to address widespread social problems.

In *Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), the Supreme Court invalidated a city ordinance because no reasonable fit existed between the regulation and the asserted interest. Motivated by its concern for safety and aesthetics, Cincinnati used a pre-existing ordinance, which prohibited distribution of "commercial handbills" on public property, to remove offensive newsracks containing commercial handbills. In concluding that the ordinance violated the First Amendment, the Court held that the city had failed to establish the necessary "reasonable fit" between its legitimate interest in safety and aesthetics and the means that it had chosen to pursue that interest. Removal of 62 newsracks containing commercial speech pursuant to the ordinance ignored 1,500 to 2,000 similar newsracks that contained noncommercial speech, even though the remaining newsracks created identical aesthetic and safety problems. *Id.* at ——, 113 S.Ct. at 1510. Therefore, the Court concluded that the distinction that Cincinnati had drawn between newsracks dispensing commercial handbills and those dispensing noncommercial speech had no bearing on its asserted interests. *Id.* at ——, 113 S.Ct. at 1516.

The Court reiterated its view in *Discovery Network* that "reasonable fit" involves a more searching inquiry than rational basis review, but one less rigorous than "least restrictive means." Consideration of alternatives is a factor in determining "reasonable fit": "A regulation need not be absolutely the least severe that will achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *Id.* at —— n. 13, 113 S.Ct. at 1510 n. 13 (internal quotations and citation omitted).

◼ Anheuser–Busch and Penn Advertising argue that the Ordinance fails to satisfy the fourth prong of the *Central Hudson* test because alternative, less burdensome means exist to reduce underage drinking, such as increased enforcement of existing laws against underage drinking and heightened campaigns to educate adolescents about alcohol consumption.

The mere suggestion of alternatives, however, does not conclusively establish that the City's chosen means are not narrowly tailored; a reasonable fit is all that is necessary: "A judge need not agree with the decisionmaker as to the most appropriate method for promoting a governmental interest; as long as there is a reasonable fit between the restriction and the interest served, the manner of regulation is left to the decisionmaker." *Destination Ventures v. F.C.C.*, 844 F.Supp. 632, 639 (D.Or.1994) (citations omitted). In other words, although consideration of alternatives is an element of "reasonable fit," it is not dispositive.

Anheuser–Busch and Penn Advertising further assert that the Ordinance is not narrowly tailored because its numerous exceptions make the net reduction of the number of alcohol advertisements to which children are exposed minute. The Supreme Court, however, has rejected the need for a regulation to address every source of harm in order to withstand constitutional scrutiny. In *Edge*, the Court stated:

> Nor do we require that the Government make progress on every front before it can make progress on any front. If there is an immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason

---

5. The party that seeks to uphold a restriction on commercial speech must affirmatively show that a reasonable fit exists between the regulation and

the asserted interest. *Fox*, 492 U.S. at 480, 109 S.Ct. at 3034–35.

that the policy of decreasing demand for gambling is correspondingly advanced. Accordingly, the Government may be said to advance its purpose by substantially reducing lottery advertising, even where it is not wholly eradicated.

*Edge,* —— U.S. at ——, 113 S.Ct. at 2707.

Anheuser–Busch and Penn Advertising also contend that the Ordinance is invalid because the City may not deprive adults of their right to receive information flowing from commercial advertisements of alcohol in order to protect minors. They cite *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 73–75, 103 S.Ct. 2875, 2884–85, 77 L.Ed.2d 469 (1983), in which the Supreme Court invalidated a federal statute that prohibited the mailing of unsolicited advertisements for contraceptives, to support their proposition.

In *Bolger,* however, the Supreme Court recognized that the governmental interest in protecting children may in some instances justify special treatment. *Id.* at 74, 103 S.Ct. at 2884. Citing *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), which upheld a restriction on broadcasting in order to protect children, the Court emphasized the narrowness of that holding based on the uniquely pervasive and accessible nature of the broadcasting medium. *Id.* In distinguishing *Bolger* from *Pacifica,* the Court found that "[t]he receipt of mail is far less intrusive and uncontrollable" than broadcasting. *Id.* The Court noted that parents already exercise substantial control over mail once it enters their mailboxes and are entitled under a federal statute to limit their receipt of sexually provocative material. Therefore, an additional regulation prohibiting unsolicited advertisements on contraceptives was unnecessary. *Id.* at 73, 103 S.Ct. at 2884.

As in the broadcasting context, parents are similarly unable to control their children's exposure to outdoor billboard advertisements of alcoholic beverages. The Supreme Court recognized in *Packer Corporation v. Utah,* 285 U.S. 105, 52 S.Ct. 273, 76 L.Ed. 643 (1932), the unique nature of outdoor advertisements:

> Advertisements of this sort are constantly before the eyes of observers on the streets ... to be seen without the exercise of choice or volition on their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. The young people as well as the adults have the message of the billboard thrust upon them by all the arts and devices that skill can produce. In the case of newspapers and magazines, there must be some seeking by the one who is to see and read the advertisement. The radio can be turned off, but not so the billboard....

*Id.* at 110, 52 S.Ct. at 274–75 (internal quotations omitted).

For the foregoing reasons, this Court finds that a reasonable fit exists between the Ordinance and the City's asserted interests, thereby satisfying the fourth prong of *Central Hudson.*

### Public Service Announcements

Anheuser–Busch and Penn Advertising challenge the Ordinance, as applied, as unconstitutional due to its overbreadth because it impermissibly restricts their noncommercial speech in violation of the First Amendment. After baldly asserting that their Public Service Announcements ("PSAs") constitute noncommercial speech, they contend that the Ordinance must pass strict scrutiny as applied to the PSAs.

This Court notes initially that whether PSAs actually constitute noncommercial speech is arguable. Although manufacturers and advertisers purport to sponsor PSAs for the public welfare, the success of PSAs in promoting their sponsors is undeniable. By containing identifying logos or trade names, PSAs enhance the goodwill of a company, thereby advancing its selling potential. Were companies solely motivated to contribute to the public welfare, the PSAs that they sponsor would be anonymous.

However, for the purposes of this action, this Court assumes without deciding that legitimate PSAs are fully protected speech, to which the Ordinance does not apply, based on the City's concession that PSAs do not constitute commercial speech. City's Reply Memorandum in support of its Motion to Dismiss, p. 5. To the extent that manufacturers and advertisers attempt to mask ad-

vertisements as PSAs, however, those advertisements are subject to the Ordinance's restriction. Therefore, the "as applied" challenge to the Ordinance is misplaced.

Anheuser–Busch and Penn Advertising assert that their challenge to the Ordinance, as applied to their PSAs, is currently ripe for consideration. They allege that to force manufacturers and advertisers to wait until the City prosecutes them before they may raise the defense that the Ordinance is unconstitutional as applied will not adequately vindicate their First Amendment rights because the threat of prosecution may "chill" protected speech almost as severely as the actual imposition of sanctions. *See Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979); *Dombrowski v. Pfister,* 380 U.S. 479, 485–87, 85 S.Ct. 1116, 1120–21, 14 L.Ed.2d 22 (1965). As stated above, however, this Court assumes without deciding that the Ordinance does not apply to legitimate PSAs. This Court will not render an advisory opinion solely to distinguish between legitimate PSAs and true advertisements.

■ Penn Advertising further alleges that the Advertising Ban is unconstitutional because it is vague and delegates standardless discretion to those who are to enforce the Ordinance. As a matter of due process, a law is facially void if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The test of whether a statute is vague is an objective one. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 501, 102 S.Ct. 1186, 1195, 71 L.Ed.2d 362 (1982).

■ Penn Advertising professes its ignorance of the meaning of the phrase, "No person may place any sign ... or any other form of advertising that advertises alcoholic beverages in publicly visible locations." Penn Advertising contends that the Court must determine initially which of its signs constitute "advertisement," and thus are subject to the Ordinance, and which are exempt PSAs.

As stated above, this Court assumes without deciding that some legitimate PSAs exist that fall outside the scope of the Ordinance. Advertising that attempts to bypass the Ordinance by hiding under the cloak of a PSA, however, is fully subject to the ban. A sign that prominently displays a manufacturer's logo and product, for example, is clearly advertising subject to the Ordinance despite the nominal attempt to characterize it as a PSA. For a company that deals specifically with advertising to now allege that it does not know what the term "advertising" means is, in this Court's view, disingenuous. Penn Advertising, if anyone, is well versed in the subtleties of the advertising industry, and knows when it attempts to predominantly advance sales rather than enhance the public welfare. By the plain meaning of the terms, then, the scope of the restriction is clear; it covers all "advertising" of alcoholic beverages in publicly visible locations. Since a person of ordinary intelligence reasonably could be expected to determine what signs constitute advertisement, the language of the Ordinance is not impermissibly vague.

■ Penn Advertising also argues that the Ordinance unconstitutionally favors certain categories of noncommercial speech over other noncommercial speech, and certain categories of commercial speech over certain noncommercial speech. According to Penn Advertising, the exceptions contained in the Ordinance that permit advertising to occur in certain specified locations while banning PSAs from manufacturers of alcoholic beverages in nonexempt publicly visible locations, and that allow generic alcoholic beverage advertisements make the Ordinance unconstitutionally discriminatory. In advancing this argument, Penn Advertising relies on *Cincinnati v. Discovery Network,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99.

Unlike the situation in *Discovery Network,* however, the distinction between permitted and prohibited advertisements in this Ordinance rests on the effect that different mediums have on adolescents. While adolescents may see an advertisement for alcoholic beverages at Camden Yards while watching a baseball game, their exposure to that advertisement ends when the game ends. An

advertisement on an MTA vehicle or taxicab likewise presents only a fleeting image of an alcoholic beverage. In contrast, a billboard is a constant fixture in a neighborhood. It looms over children every day while they walk to school, and every time they play in their neighborhood, thus forming an inescapable part of their daily life. The Supreme Court aptly characterized the unique nature of outdoor billboards: "Advertisements of this sort are constantly before the eyes of observers on the streets ... to be seen without the exercise of choice or volition on their part." *Packer*, 285 U.S. at 110, 52 S.Ct. at 274 (internal quotations omitted). Billboard advertisements thus form a constant impetus to consume the product being advertised, the precise goal of the advertisement.

Furthermore, despite protestations to the contrary, the reality is that billboard advertisements for alcoholic beverages focus on depressed inner-city neighborhoods. Billboards are conspicuously absent from more affluent communities. They present a stark contrast to adolescents between the lifestyle depicted in the advertisement and the actual neighborhood surrounding them, thereby enhancing the attractiveness of the advertised product. The distinction among various mediums thus appropriately accounts for the difference in their treatment.

Penn Advertising's final argument is that the City exceeded the authority that the Maryland statute granted it to enact the Ordinance because the City failed to show that the restriction is necessary to promote the welfare and temperance of minors. In effect, Penn Advertising seeks to bypass any deference that the Court may afford the legislature pursuant to the Twenty-first Amendment by raising this statutory argument as a separate Count, in which the Twenty-first Amendment does not apply. Because the Court has upheld the Ordinance under *Central Hudson*, however, without reference to the effect of the Twenty-first Amendment on the City's authority to regulate commercial speech, this argument in effect simply involves an analysis of whether the regulation "directly advances" the City's asserted interest and whether a reasonable fit exists between the regulation and the governmental interest.

### Conclusion

For the reasons stated above, the Court holds that Article 30, Section 10.0–1H and Article 30, Section 11.0–7 of the Baltimore City Code, as promulgated by Bill No. 626, does not violate the First Amendment to the Constitution or Article 40 of the Maryland Declaration of Rights.

In accordance with this memorandum opinion, it will be so ordered.

### ORDER

For the reasons set forth in the attached Memorandum Opinion, this Court holds that Article 30, Section 10.0–1H and Article 30, Section 11.0–7 of the Baltimore City Code, as promulgated by Bill No. 626, does not violate the First Amendment to the Constitution or Article 40 of the Maryland Declaration of Rights.

Therefore, IT IS this 28th day of March, 1994, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That Defendants' Motion to Dismiss BE, and the same hereby IS, GRANTED.

2. That the Clerk of the Court CLOSE this case.

3. That the Clerk of the Court mail copies of this Order to all parties of record.